THEONELLA WROBLEWSKI, ADMX. EST. OF ALEX WROBLEWSKI
v. GRAND TRUNK WESTERN RAILWAY CO. ET AL.

[No. 471A68. Filed December 21, 1971. Rehearing denied
January 28, 1972. Transfer denied June 29, 1972.]

*Roland Obenchain,* of South Bend, for appellant.

*Shepard Crumpacker, Bruce J. Bon Durant,* of South Bend, for appellee, Grand Trunk Western Railway, *Robert J. Du-Comb, Jr., Robert J. DuComb, Sr.,* of South Bend, for appellee, Board of Commissioners.

BUCHANAN, J.—*STATEMENT OF THE CASE AND FACTS*—This is an appeal from a wrongful death action brought by Theonella Wroblewski (Mrs. Wroblewski), wife of Alex "Peanuts" Wroblewski (the Deceased), arising out of the railroad-crossing-death of her husband. The trial court entered a directed verdict in favor of defendants-appellees,

Grand Trunk Western Railway Company (the Railway) and the Board of Commissioners of the County of St. Joseph (County Commissioners).

On September 2, 1968—a clear, sunny day—the Deceased attended a political picnic near South Bend, Indiana, where beer was served.

Prior to 4:00 P.M., he left the picnic and proceeded north along Peach Road alone in his '68 Lincoln automobile. (Peach Road is located in a rural area and runs in a north-south direction.) He stopped to talk to some friends in another automobile who testified that he did not seem inebriated. After ending the conversation, the deceased continued north on Peach Road.

At approximately 4:00 P.M., he neared an intersection with the Railway's railroad tracks which is about 2½ miles west of the City of South Bend, Indiana. (The tracks lie in an east-west direction and are slightly elevated above Peach Road.) As he did so a train operated by the Railway was approaching from the east traveling 79 miles per hour. The Deceased's car struck the train twenty feet from its extreme front end—he died instantly. Evidence showed that the deceased's car skidded 88 feet before colliding with the train. As it approaches the railroad tracks Peach Road is straight and uncontoured.

Mrs. Wroblewski's action against the Railway, among other things, alleged negligence for failing to construct and maintain a proper warning sign and for allowing brush, weeds, undergrowth, foliage and trees to grow unabated on and around its right of way, thereby obstructing the view of the tracks from Peach Road. Substantially the same allegation of negligence for allowing brush, weeds, undergrowth, etc., to grow up unabated along the Peach Road right of way, thereby obstructing the view of the tracks, was made against the Commissioners. She did not allege, nor was the case tried on the theory, that the grade crossing was an extra hazardous one.

The investigating officer later at the scene of the accident testified as to various physical facts. At the grade crossing there was a nonmechanical cross-arm warning sign with the words, "Danger," "Railroad," and "Crossing" appearing thereon, sometimes referred to as a cross-buck sign (herein referred to as Highway Crossing Sign). There was no flasher, bell, or mechanical moving arm. He found no uniform danger disc sign (herein referred to as Danger Sign) indicating the presence of a railroad at any point on Peach Road south of the railroad tracks. His inspection of Peach Road south of the tracks covered three to five hundred feet and revealed that at one point there was a slight obstruction and while walking toward the tracks there is one point where the tracks went out of vision.

Nineteen photographs were introduced into evidence showing the railroad crossing from various views including Peach Road south of the crossing which exhibit the possibility of undergrowth and a tree obscuring the view of the tracks as the Railway's train approached Peach Road from the west at 79 miles per hour. Some of these photographs indicate the presence of undergrowth and brush along and near the Railway right of way as it approaches the crossing. There was no evidence presented as to the exact location of these possible obstructions as to whether located within the Peach Road right of way, the Railway right of way, or adjacent farm land, other than as exhibited in the photographs.

The Railway admitted that no Danger Sign was present 300 feet south of the grade crossing.

After Mrs. Wroblewski presented her evidence, the lower court granted the Motion for a Directed Verdict of the Railway and the County Commissioners.

*ISSUES—One.* Was there any evidence of negligence on the part of the Railway, or a reasonable inference thereof, which could have been the basis for submitting the case to a jury?

*Two.* Was there any evidence of negligence on the part of

the County Commissioners, or a reasonable inference thereof, which could have been the basis for submitting the case to a jury?

Mrs. Wroblewski contends that the evidence was sufficient for the jury to draw a reasonable inference of negligence on the part of both the Railway and the County Commissioners for their failure to install and maintain a Danger Sign 300 feet south of the railroad crossing pursuant to Ind. Ann. Stat. § 55-2001 *et seq.* (Burns 1951). She also alleges that both were negligent in allowing vegetation and undergrowth to obscure the view of the tracks from Peach Road. Finally, Mrs. Wroblewski alleges that the Railway was negligent in operating its train at 79 miles per hour under the conditions then existing and for failure to keep a proper lookout and sound its whistle.

The Railway's position is that the mere fact that the warning sign was not present on the day of the accident does not mean that it was never installed during the 47 years preceding September 2, 1968. The Railway admits its duty to install the Danger Sign but denies any duty to maintain, repair, or replace such signs claiming the County Commissioners must repair them and the Public Service Commission must order and deliver replacement Danger Signs whenever necessary. Further, it argues that Mrs. Wroblewski had the burden of proving the Danger Sign was never installed by the Railway which she failed to do.

The County Commissioners contend that before the duty to repair is created, the Danger Sign must be installed by the Railway. If it must be replaced, the Public Service Commission must do so. Since there was no evidence that the sign was ever installed, no duty to repair was proven. Even if there was a duty to repair, that duty does not include the duty to replace.

*DECISION—One.* It is our opinion that there was a reasonable inference of negligence on the part of the Railway to be

drawn from the evidence. Consequently, the case against the Railway should not have been taken from the jury.

There is considerable Indiana authority dealing with the question of the quantum of evidence necessary for a plaintiff to avoid a directed verdict at the close of his evidence. We need only say here that a trial court should not direct a verdict against a plaintiff at the close of his evidence if the evidence is such that the minds of reasonable men might differ, or if the determination of negligence depends on conflicting evidence. See Hendrix v. Harbelis (1967), 248 Ind. 619, 230 N. E. 2d 315; Whitaker v. Borntrager (1954), 233 Ind. 678, 122 N. E. 2d 734; Hollowell v. Greenfield (1966), 142 Ind. App. 344, 216 N. E. 2d 537.

In order to determine if there was evidence or a reasonable inference therefrom about which the minds of reasonable men might differ, establishing negligence on the part of the Railway, we must first search for a statutory duty by the Railway to install and maintain Danger Signs. The warp and woof of such a duty, if it exists, is the legislative plan relating to railroad crossings. Our examination of the pertinent statutes reveals the legislature has protected the traveling public by defining the duties and responsibilities of railroads and government agencies in an effort to make railroad grade crossings as safe as possible.

Relevant sections are:

55-2001 [13124]. "Warning signs required.* — From and after January 1, 1914, it shall be unlawful for any person, firm or corporation, or the lessee or receiver of any person, firm or corporation, who shall own or operate any line of steam or interurban railroad in this state to run trains on the same without installing and maintaining, at each grade crossing of its railroad with any public highway, highway crossing signs; to be placed at right angles with the highway, where possible, and the construction of the same and warning notice to be as follows: A substantial upright post, thirteen [13] feet or more in length, three and one-half [3½] feet of which shall be in the ground; a board of wood or metal to be placed not closer to the ground

than seven [7] feet on this post, at right angles with the post, on which shall appear the word 'Danger' in red or black letters; two [2] other boards to be placed diagonally across each other just above the board on which the word 'Danger' is printed, and on one of the two [2] boards the word 'Railroad' shall appear, and on the other the word 'Crossing.' Where two [2] railroads are crossed by the highway, parallel with each other, and not further than one hundred [100] feet distant from each other, a board shall be placed at the top of the diagonal boards on which shall appear the word 'Two'; the boards on which the word 'Danger' is written shall be at least four [4] feet in length; the boards on which the words 'Railroad Crossing' is [are] written shall not be less than five [5] feet in length, and where there are two [2] railroads to be crossed, the board with the word 'Two' on it shall not be less than two [2] feet in length; the size of all letters on the signs shall not be less than six [6] inches high; Provided, That the crossing signs of carriers in this state heretofore approved by the railroad commission [public service commission] may remain and be taken as a compliance with the terms of this act [§§ 55-2001, 55-2002]: And provided, further, That any other sign than the type described above may be constructed and used with the consent of the railroad commission [public service commission] of Indiana: And provided, further, That this section shall not apply to crossings within cities or incorporated towns. [Acts 1911, ch. 224, § 1, p. 543; 1913, ch. 242, § 1, p. 676.]''

*(The "warning signs" described in this section are referred to in this opinion as Highway Crossing Signs.)

55-2003 [13126]. "Uniform danger signs.**—*In addition to the highway crossing signs* which steam and interurban *railroad companies are now required by law to install and maintain* at grade crossings on public highways in this state, *additional uniform danger signs shall likewise be installed and maintained* at all such grade crossings in the manner hereinafter prescribed in this act [§§ 55-2003—55-2011]. [Acts 1921, ch. 232, § 1, p. 678.]''

**(The "uniform danger signs" described in this section are referred to in this opinion as Danger Signs.)

55-2004 [13127]. "Installation of signs.—*All such additional danger signs* shall be uniform in appearance, character, size, material, color and lettering throughout the state, *shall be installed at each grade crossing in this state at a distance of three hundred [300] feet in either direction from the point of intersection* of the highway and the steam

or interurban railroad, *and on the right hand of persons approaching* such railroad crossing, shall be securely set in concrete, within the highway, and as near to the edge of the traveled part thereof as may be safest and most convenient to the traveling public, and shall be erected at such height above the surface of the highway as to be seen to the best advantage by the reflection of the ordinary lights used on automobiles approaching the crossing. [Acts 1921, ch. 232, § 2, p. 678.]"

55-2005 [13128]. "Adoption of the standard sign.—Within thirty [30] days after the taking effect of this act, the public service commission shall prescribe and adopt a standard, uniform, additional danger sign, to be installed at all grade crossings on public highways, as hereinbefore prescribed in this act . . . [§§ 55-2003—55-2011]. [Acts 1921, ch. 232, § 3, p. 678.]"

55-2006 [13129]. "Signs and posts—Contract to make —Purchase.—All such danger signs shall, as far as possible, be manufactured at such of the penal and correctional institutions of this state as may be equipped to produce signs of the prescribed character, and no such signs shall be purchased elsewhere unless such penal and correctional institutions are unable to supply the number or the kind of signs required. The number of signs which will be required to comply with the provisions of this act [§§ 55-2003—55-2011] shall be determined by the public service commission and the order or contract for supplying the same shall be placed or awarded by the public service commission within ninety [90] days after the taking effect of this act. The order or contract shall first be offered to the penal or correctional institutions of this state and, if such institutions be not equipped to manufacture and supply the requisite number of signs of the prescribed character, the order or contract, or such part thereof as such institutions are not able to supply, shall then be placed with or awarded to any private manufacturer who shall submit the lowest and best bid for the work and after notice thereof shall have been given by publication in not less than two [2] issues of two [2] newspapers published in the city of Indianapolis, and enjoying the largest circulation throughout the state, and by an equal number of insertions in an appropriate technical journal. The order or contracts for the posts on which such signs are to be erected shall be placed with or awarded to any person, firm or corporation who shall submit the lowest and best bid therefor, and after notice thereof shall have been given by publication as here-

inbefore provided in this section. [Acts 1921, ch. 232, § 4, p. 678.]"

55-2007 [13130]. "Delivery of signs, cement, and gravel. —As rapidly as such signs or posts are manufactured and ready for delivery, they shall be delivered to the various steam railroad and interurban railroad companies, in such quantities and in accordance with such plan of distribution as shall be determined by the public service commission, and the several steam or interurban railroad companies shall pay all costs of transportation of such signs or posts from the place where they may be manufactured or produced to the place where they are delivered to such steam or interurban railroad company. Upon receipt of consignment of signs or posts by any steam or interurban railroad company, such company shall transport and distribute such signs or posts to the various highway crossings of such railroad where they are to be installed and such companies shall likewise supply all gravel and cement which may be needed to install the posts on which such signs are erected and shall see that such gravel and cement is delivered at the proper time and place and in such quantities as may be needed. [Acts 1921, ch. 232, § 5, p. 678.]"

55-2008 [13131]. "Railroads to install danger signs— Penalty.—Each steam and interurban *company shall install all danger signs* and the posts wheron such danger signs are erected at each and every grade crossing along its entire line or lines of railroad within this state as prescribed in this act [§§ 55-2003—55-2011]. The public service commission shall determine the period of time which shall be allowed for each steam and interurban company to install such signs after the entire consignment of signs and posts allotted to any such railroad shall have been delivered, and any such railroad company which shall fail or refuse to install such signs within the time so prescribed, or any reasonable extension thereof, to be determined by the public service commission, shall forfeit to the state of Indiana the sum of fifty dollars [$50.00] per day for each and every day that such failure or refusal shall continue after the expiration of the time as fixed by the public service commission. [Acts 1921, ch. 232, § 6, p. 678.]"
(Emphasis supplied.)

§ 55-2001, *supra,* enacted in 1911, made it unlawful for railroad companies to operate a railroad in this state *"without installing and maintaining"* at each grade crossing a Highway

Crossing Sign as described therein. The presence of this Highway Crossing Sign at the crossing in question is not in dispute and it shows clearly in some of the photographs in evidence.

In keeping with an obvious plan to protect the traveling public, the Legislature then enacted § 55-2003 to § 55-2010, in 1921, so that two warning signs would henceforth be required at railroad crossings. The "additional" or second type of warning sign required by § 55-2003, and referred to herein as the Danger Sign, as finally adopted by the Public Service Commission is a round metal sign indicating the presence of a railroad crossing. It must be installed by the railroad at a distance of 300 feet in both directions from the point of intersection of the highway and the railroad.

The unmistakable legislative intent is that each railway crossing have two warning signs, the Highway Crossing Sign at the crossing itself and the Danger Sign 300 feet from the crossing.

By using the words, "installing and maintaining" in 55-2001, and the words, "install and maintain" in 55-2003, the responsibility is placed on railroad companies to *install* and *maintain* these two warning signs. Ten years after the Legislature begat the Highway Crossing Sign, it saw the need for the Danger Sign and cross-fertilized it with the same requirement that it be installed and maintained by the railroads.

The interrelation of these two statutes seems to us to be clearly established by the wording of these two sections. Particularly indicative of this relationship is that part of § 55-2003, which says, "additional uniform danger signs shall *likewise be installed and maintained.*" The Railway ignores the existence of 55-2003 in its brief and seeks to place the burden of maintenance of Danger Signs on either the County Commissioners who are required to repair and pay for them by § 55-2009, or on the Public Service Commission who is required to order and deliver them by §§ 55-2007 and 55-2010.

However, none of these sections have explicit language nor can any meaning be implied which relieves the railroad companies from the duty of installing and maintaining Danger Signs.

Reading these sections together as we are bound to do, we must give meaning to the word "maintain." If the railroad companies are required by the statutory plan to "install" the Danger Signs and the Board of County Commissioners is required to repair them and the Public Service Commission is required to order and deliver replacement signs, who is responsible for notifying the Public Service Commission of the need for a replacement sign and actually putting it in place? We think this duty falls upon the railroad companies because it lies naturally within the meaning of the word, "maintain." This means each railroad company bears the responsibility for determining in the first instance which Danger Signs are missing or no longer serviceable.

While there is some diffusion of responsibility as between the various agencies involved in the erection, maintenance, repair and replacement of Danger Signs, the twin duties on railroad companies of installing and maintaining the Danger Signs carries out the statutory purpose of safeguarding the traveling public.

Further, we interpret the word "install" in the statutory context to also mean re-install. We do not construe §§ 55-2005, 55-2006, 55-2007, 55-2009, or 55-2010, as in anyway diminishing or eliminating the duty of railroads to install and maintain Danger Signs. To do so would be to defeat the legislative purpose of protecting the traveling public by a system of warning signs at railroad crossings.

In seeking to avoid the duty of replacing Danger Signs no longer in existence the Railway's argument implies that the duty to repair should include the duty to replace. The word "repair" however, contemplates an existing structure, and does not mean replacement. *Childers* v. *Speer* (1940), 63 Ga. App. 848, 12 S. E. 2d 439. Also, we find

authority that "maintain," as opposed to "repair," means to restore and rebuild *after decay or destruction. Rhodes* v. *Mummery* (1874), 48 Ind. 217; *State* v. *Chicago, Milwaukee & St. Paul Railway Co.* (1916), 164 Wis. 304, 159 N. W. 919. So repair and maintenance are not identical. In our opinion this construction fairly interprets each of the sections bearing on this particular responsibility. *New York Central Railroad Co.* v. *Public Service Commission of Indiana* (1957), 237 Ind. 544, 549, 147 N. E. 2d 547. As no danger sign was present 300 feet south of the grade crossing on Peach Road it could reasonably be inferred by prudent men that the sign was missing due to the Railway's violation of their statutory duty to install the sign or, alternatively, due to their failure to properly maintain the sign after installation. It is also reasonable to assume that had the sign been present on September 2, 1968, collision between the Deceased's Lincoln and the Railway train might never have occurred.

Generally, where a duty is imposed by statute requiring a particular precaution or prohibiting certain conduct, violation of that statute is negligence per se. *New York Central Railroad Co.* v. *Glad* (1961), 242 Ind. 450, 179 N. E. 2d 571; *Larkins* v. *Kohlmeyer* (1950), 229 Ind. 391, 98 N. E. 2d 896. In *Indiana, Bloomington & Western Ry. Co.* v. *Barnhart* (1888), 115 Ind. 399, 409, 16 N. E. 121, our Supreme Court held that:

> "[T]he general rule is, that where an obligation is imposed by a statute, it is negligence *per se* to disregard the obligation thus imposed, and, if injury is thereby inflicted, the party disregarding the statute is liable."

This rule was reaffirmed in *New York Central Railroad Co.* v. *Glad, supra.* Likewise, a violation of a statute designed to promote *safety* is negligence per se. *New York Central Railroad Co.* v. *Glad, supra; Northern Indiana Transit, Inc.* v. *Burk* (1949), 228 Ind. 162, 89 N. E. 2d 905. Furthermore, in *Pennsylvania R.R. Co.* v. *Huss* (1933), 96 Ind. App. 71, 78, 180 N. E. 919, this court held that:

"The primary purpose of signals, gates, other devices, and of watchmen when required to be maintained at points where railroad tracks intersect highways, streets, etc., is to warn persons traveling on and over such ways that a train is approaching *and to protect them from damage or injury likely to ensue if they attempt to use such crossing before the train passes thereover."* (Emphasis supplied.)

There is no dispute that the Deceased was a traveler over such a crossing. Consequently, he fell within the class designed to be protected by §§ 55-2001 *et seq., supra.*

In *Martin* v. *Herzog* (1920), 228 N. Y. 164, 126 N. E. 814, Justice Cardozo said that:

"A statute designed for the protection of human life is not to be brushed aside as a form of words, its commands reduced to the level of cautions, and the duty to obey attenuated into an option to conform."

In spite of this, negligence per se does not necessarily mean liability per se since there may be facts and circumstances which would excuse a violation of a statute.

"In such instances there may or may not be actionable negligence and it is a question of fact, to be determined by the court or jury trying the case, from all the facts and circumstances shown by the evidence, (1) whether there was a sufficient and reasonable excuse for such violation, and (2) whether in doing, or omitting the act complained of, the defendant was in fact guilty of actionable negligence." *Larkins* v. *Kohlmeyer, supra* at 399.

Only a trial to the jury can determine whether such an excuse exists.

In addition to the possible negligence arising out of the violation of its statutory duty to install and maintain the Danger Sign there is another reason the Railway was not entitled to a directed verdict. Of the nineteen photographs of the scene introduced into evidence a careful examination of at least four of them lend credence to Mrs.

Wroblewski's argument that the Railway was negligent in allowing undergrowth, foliage, and brush to obscure the view of the railroad tracks from Peach Road as the Deceased approached from the south, (Plaintiff's exhibits 4, 7, 17 and 19). Plaintiff's exhibits 17 and 19 particularly could reasonably be interpreted by the jury as showing the Railway negligently allowed such undergrowth, brush, and foliage to accumulate on, or along its right of way, or, if located elsewhere than on its right of way it was negligent in permitting its train to pass a crossing with vision wholly or partially obscured at a high rate of speed (79 miles per hour). Under these conditions there appears to be more than a mere scintilla of evidence on which the jury might reasonably infer negligence on the Railway's part. Reasonable men examining these photographs could differ as to whether the deceased might have avoided colliding with the train had his view of the tracks not been obscured. *Hendrix* v. *Harbelis, supra; Whitaker* v. *Borntrager, supa; Hollowell* v. *Greenfield, supra.*

*Two.* It is our opinion that there was no evidence of negligence on the part of the County Commissioners, or a reasonable inference to be drawn thereof. Thus, the case against the County Commissioners was properly withheld from the jury.

Ind. Ann. Stat. § 55-2009, *supra,* imposes a duty on the County Commissioners to repair any danger signs contemplated by Ind. Ann. Stat. § 55-2001 *et seq.* § 55-2009 provides:

> "Repair of signs—Additional signs.—*All danger signs* contemplated in this act *shall be kept in repair by the board of commissioners of the county* in which they are installed. *As additional danger signs and posts are needed to replace such as are no longer serviceable,* or to install at grade crossings established after the passage of this act, *such signs and posts shall be ordered by the public service commission and delivered to the point where they are needed* by the railroad affected, as provided for in sections four and five [§§ 55-2006, 55-2007] in this act." (Emphasis supplied.)

Repair, as opposed to maintain, means to mend or to restore to a sound or good state after injury or *partial* destruction. *Board of Education of Hancock County, Board of Education of Vanlue Village School District* v. *Oman* (1922), 105 Ohio St. 237, 136 N. E. 913. Furthermore, repair contemplates an existing structure. *Childers* v. *Speer, supra.*

If the sign was never installed by the Railway, then the duty to repair was never created as the County only has a duty to repair signs which have been installed. § 55-2009, *supra.* If the Railway did install the sign prior to the accident, and that due to some unknown circumstances the sign was missing on September 2, 1968, the County Commissioners were still not negligent. As we indicated above, repair contemplates an existing structure, *Childers* v. *Speer, supra;* so the duty to repair does not include the duty to *replace* the missing sign.

Therefore, given the facts of this case the County Commissioners could not be responsible for the missing uniform danger sign on the day of the accident.

Mrs. Wroblewski's second allegation against the County Commissioners is that they were negligent in allowing trees, brush, and other vegetation to conceal and obstruct the railroad tracks. She cites Ind. Ann. Stat. §§ 30-301, 302 (Burns 1969) as imposing a duty upon the County Commissioners to trim any vegetation growing within 100 feet of an intersection of a highway and railroad to a height of not more than five feet. In addition, any trees growing within 50 feet of such intersection are to be trimmed so as to make clear the view of the intersection. In pertinent part, § 30-301 provides:

> "Hedges and live fences at intersections and crossing—Height—Other obstructions—Trees—Limitations on application of act.—All hedge or live fences along the line of any highway within the state of Indiana shall be cut and trimmed down to a height of not to exceed five [5] feet, in all cases where hedges or live fences or any other natural growths, except trees, connect with or are found at . . .

any railway or interurban right-of-way . . ., and such altitude shall be maintained throughout the year for a distance of one hundred [100] feet where the obstruction if a hedge fence and fifty [50] feet where the obstructions consist of any other natural growths, except trees . . . Where trees are found growing within fifty [50] feet of any intersection of any highway with another highway or with a steam or interurban railroad, such trees shall be so trimmed that the view at such intersection will not be obstructed. . . ."

However, § 30-302 *supra,* only requires the County to inspect these sites twice a year, and if it finds any obstruction mentioned under § 30-301, *supra,* then the County must give notice to the owner of the land, upon which the obstruction is growing, to cut or trim such obstruction. So says § 30-302, *supra:*

"Duties of officials in control of highway—Notice to owners or agent—Enforcement of costs when work done by public officials.—*It shall be the duty of the trustee of each township or the county highway superintendent,* or the state highway commission, or other proper officer in control of the maintenance of said highways, between the first day of January and the first day of April of each year *to examine all hedge or live fences or other natural growths along the highways* and such other obstructions as described in section 1 [§ 30-301] of this act in their respective jurisdictions *and if there shall be any hedge or live fences or other growths or obstructions* along such highways which have not been cut, trimmed down and maintained to the height of not to exceed five [5] feet, *they shall give the owner or owners thereof written notice to cut or trim such hedge or live fence* and to burn the brush trimmed therefrom or remove any other obstructions or growths as hereinbefore described, . . ." (Emphasis supplied.)

Mrs. Wroblewski failed to present any evidence as to whether the County did or did not inspect this particular site and whether it did or did not notify the Railway or any other owner of obstructions found, if indeed any were found. Likewise, no evidence was presented as to who owned the land upon which the purported vegetation was growing. Did this

land belong to the County, the Railway, or a private owner? There is not even a scintilla of evidence as to ownership of the land areas in question.

Therefore, we are of the opinion that the record is completely void of *any* evidence from which a jury could infer negligence by the County Commissioners in allowing weeds and other vegetation to obstruct the view of the railroad tracks. Accordingly, any decision by a jury would have to be founded on surmise and conjecture, not reasonable evidence. *Mamula* v. *Ford Motor Co.* (1971), 150 Ind. App. 179, *Hollowell* v. *Greenfield, supra.*

Since no evidence was presented on which reasonable minds could differ, the question of the negligence by the County Commissioners was properly withheld from the jury.

Accordingly, the decision of the trial court is therefore affirmed as to the County Commissioners and reversed and remanded for a new trial as to the Railway.

Sullivan, P. J., Lowdermilk and Robertson, JJ., concur.

NOTE.—Reported in 276 N. E. 2d 567.