**Ralph JOHNSON and Nardine Johnson, Plaintiffs,**

**v.**

**BALTIMORE & OHIO RAILROAD COMPANY, Defendant.**

**No. 71 H 151.**

United States District Court, N. D. Indiana, Hammond Division.

Dec. 17, 1974.

Max Cohen, Gary, Ind., for plaintiffs.

Charles G. Bomberger, Hammond, Ind., for defendant.

## OPINION AND ORDER

ALLEN SHARP, District Judge.

This is an action for personal injury damages based upon diversity of citizenship. The defendant railroad was charged with various acts of negligence and the plaintiff, Ralph Johnson, was charged with contributory negligence. On September 11, 1974 the jury returned a verdict for Ralph Johnson in the sum of $325,000.00 and for Nardine Johnson in the sum of $50,000.00 and judgments were accordingly entered thereon.

### I

On September 23, 1974 the defendant filed a motion for judgment notwithstanding the verdict upon grounds that the Court should have granted the defendant's motion for a directed verdict at the close of all the evidence because the plaintiff's evidence was insufficient in law and that all of the evidence is insufficient in law to form a basis for a verdict for the plaintiffs. Said motion for judgment notwithstanding the verdict was not supported by any memorandum or citation of authority.

The test for a directed verdict is whether the evidence is such that without weighing the credibility of witnesses or otherwise considering the weight of evidence there can be but one conclusion as to the verdict that reasonable men could have reached and the jury reached a contrary conclusion. See Classic Bowl, Inc. v. AMF Pinspotters, Inc., 403 F.2d 463 (7th Cir. 1968).

The right to determine the credibility of witnesses lies at the heart of the jury's function. If there is conflicting testimony on a material issue, the Court may not grant a directed verdict or a judgment notwithstanding the verdict because the Court believes one witness and does not believe another. A conflict of this kind can only be resolved by the jury. See Sano v. Pennsylvania Railroad Co., 282 F.2d 936 (3rd Cir. 1960).

In a case based on diversity of citizenship in a Federal Court State law governs on the question of whether a verdict should be directed. See Etling v. Sander, 447 F.2d 593 (7th Cir. 1971), and Perzinski v. Chevron Chemical Co., 503 F.2d 654 (7th Cir. 1974). See also, Karczewski v. Ford Motor Company, 382 F.Supp. 1346 (N.D.Ind.1974). Recent Indiana cases which are squarely in point demonstrate that a verdict should not have been directed and the motion for judgment notwithstanding verdict should be denied. See Wroblewski v. Grand Trunk Western Railway Company, Ind.App., 276 N.E.2d 567 (Trans. denied June 28, 1972), and Smith v. Chesapeake & Ohio Railroad Company, Ind. App., 311 N.E.2d 462 (Trans. denied November 12, 1974). Therefore, said motion for judgment notwithstanding verdict is denied.

### II

On September 20, 1974 the defendant filed motion for new trial asserting the following specifications of error:

1. The verdicts of the jury are not sustained by sufficient evidence.

2. The verdicts of the jury are contrary to law.

3. The damages assessed by the jury are excessive.

4. Error of law in giving to the jury Court's Instruction No. 17.

5. Error of law in giving to the jury Court's Instruction No. 32.

6. Error of law in refusing to give to the jury defendant's tendered Instructions Nos. 20 and 25.

7. Error of law in giving to the jury Court's Instruction No. 33.

Said motion for a new trial was supported by an extensive memorandum brief. The plaintiff filed a brief in opposition to the motion for new trial on October 1, 1974 and on November 22, 1974 the de-

fendant filed a supplemental brief in support of the motion for a new trial together with a requested summary of the evidence. On November 26, 1974 the plaintiffs filed a supplemental answer in opposition to defendant's motion for a new trial. The Court also heard the oral argument of counsel on the motion for a new trial on November 27, 1974.

The Court now proceeds to take up and decide the various issues raised by the defendant in said motion for new trial.

As a backdrop the Court is well aware of the standard for consideration of the motion for a new trial as stated by Judge John J. Parker in the landmark and oft-quoted case of Garrison v. United States, 62 F.2d 41 (4th Cir. 1932). See also, Reid v. Maryland Casualty Company, 63 F.2d 10 (5th Cir. 1933). The key sentence from Judge Parker's opinion is found at 62 F.2d page 42 as follows:

"Verdict may be set aside and new trial granted, when the verdict is contrary to the clear weight of the evidence, or whenever in the exercise of a sound discretion the trial judge thinks this action necessary to prevent a miscarriage of justice."

The defendant here emphatically asserts that there has been a miscarriage of justice. For the reasons herein assigned this Court finds no such miscarriage of justice and therefore now denies the defendant's motion for a new trial for the reasons herein stated.

Under the first specification of the motion for a new trial the defendant argues that the plaintiff, Ralph Johnson, was guilty of contributory negligence as a matter of law and, of necessity, must argue that the evidence on this issue which was before the jury can lead only to that conclusion. Since this is an issue of substantive law in a diversity jurisdiction case, the Court must look to the law of Indiana for its determination. The defendant relies upon the so-called stopping statute which is I.C. 1971, 9–4–1–106, Burns' Ind.St.Ann. § 47–2114. The plaintiff testified that he stopped his vehicle at a point 20 to 30 feet from the railroad crossing in question "where visibility was good". The plaintiff also testified that because of the weeds and undergrowth along the defendant's right-of-way he could only see approximately 200 or 300 feet down the track in the direction from which the defendant's train was approaching. The question of the plaintiff's visibility down the track was seriously disputed before the jury. Photographic evidence provided by the defendant was disputed before the jury in terms of the various positions of the camera and the various conditions under which the photographs were taken. (In fact, Judge Beamer referred to this very same dispute in denying a motion for summary judgment filed by the defendant.) The plaintiff argued before the jury that the defendant's photographs were not taken from a position and under circumstances to accurately describe the visibility that was available to the plaintiff at the point where the plaintiff says he stopped before this railroad track. The plaintiff also asserts that there were changes in the foliage and undergrowth from the time of the collision in question to the time the photographs were taken. There is evidence to support that assertion.

The jury had to determine whether the plaintiff in fact stopped as required by statute not less than 10 nor more than 50 feet from the nearest rail at this crossing, the jury had to determine the point at which any such stop may have occurred, if, in fact, it did occur, and the jury had to determine the range of visibility down the track which was available to the plaintiff at that time. Closely related to the question as to whether the plaintiff stopped and looked is the question of whether or not the train sounded its whistle and rang its bell as required by Indiana Statutes, I.C. 1971, 8–6–4–1, Burns' Ind.St.Ann. § 55–

1243. There were four witnesses called by the plaintiff who were in the immediate vicinity of the crossing at the time the train approached and the collision occurred. All of these witnesses, who had no connection with either side of the case, testified in effect that they heard no whistle or bell on this train although it was possible to hear a whistle and bell in that immediate area. One of them testified that immediately after the collision the conductor of the train approached and said "We hit a car; I got to get to the phone; we had to back up about two miles." These witnesses called by the plaintiff were vigorously cross-examined by defense counsel as to where their attentions were directed at the time in question. The engineer and fireman testified that they rang the bell and blew the whistle for this crossing precisely in accord with the statute and had done so for every other crossing on this train's trip from Garrett, Indiana to the crossing in question. The conductor, who was called as a witness for the defendant, was not asked to testify with reference to the sounding of the whistle and the ringing of the bell. There was evidence that this train could travel as fast as 90 miles per hour as it was loaded and equipped. The speed tape on this train, which was under the control of the defendant, was not produced.

The members of the train crew were vigorously cross-examined on the subject of the sounding of the whistle and the ringing of the bell and what the effect of any failure to do so might have on their employment. The plaintiff, Ralph Johnson, testified categorically that the train did not ring a bell and sound a whistle as it approached this crossing.

Thus, the jury had before it a range of inferences which could permit them to have found that the train did not sound its whistle and ring its bell as required by statute and that the plaintiff did stop and look for the train consistent with his statutory obligations. The Court finds nothing in the record on either one of these issues to compel the granting of a new trial in this case.

The most recent statement of the law that relates to the question of contributory negligence as a matter of law in this context is Smith v. C & O Railroad Co., Ind.App., 311 N.E.2d 462 (1974), (rehearing denied November 12, 1974). The Court considers *Smith* as very strong and persuasive authority for permitting the jury to decide both the question of negligence and failure to blow the whistle and sound the bell and the question of contributory negligence of the plaintiff. See also, Baker v. Fisher, Ind.App., 288 N.E.2d 263 (1972), transfer dismissed June 12, 1973.

This Court cannot find in this case the kind of a factual situation that prevailed in New York Central Railroad v. Glad, 242 Ind. 450, 179 N.E.2d 571 (1962), Pratt v. New York Central Railroad, 339 F.2d 964 (7th Cir. 1964), and Moss v. Pennsylvania Railroad Co., 146 F.2d 673 (7th Cir. 1945). This case is much more in line with Leon v. Penn Central Company, 428 F.2d 528 (7th Cir. 1970) and Kish v. Norfolk and Western Railway Co., 426 F.2d 1132 (7th Cir. 1970).

When the evidence offered by the four witnesses is taken together with the plaintiff's evidence the same is sufficient to present a jury question on the two subjects of the plaintiff's stopping and looking and the defendant's sounding the whistle and ringing the bell. Such evidence therefore presents a choice of inferences and not the single inference.

The Court, therefore, cannot determine, consistently with its proper function in considering a motion for a new trial, that the weight of the evidence establishes that the plaintiff was guilty of contributory negligence as a matter of law. For the same reasons the verdicts of the jury are not contrary to law.

### III

The defendant next argues that the damages awarded to the plaintiff, Ralph Johnson, in the sum of $325,000.00 is so excessive as "to strike mankind at first blush, as being beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption", citing Northern Indiana Public Service Company v. Otis, 145 Ind.App. 159, 187, 188, 250 N.E.2d 378, 397 (1969). Also citing Murphy v. United States District Court, 145 F.2d 1018, 1020 (9th Cir. 1945).

■■ The question of excessiveness of verdict in a Federal District Court hearing the case on the basis of diversity jurisdiction is one governed by Federal law and not State law. See Footnote 1, Galard v. Johnson, 504 F.2d 1198 (1974). However, it would appear from the most recent decisions of the Court of Appeals of Indiana and the Court of Appeals for the Seventh Circuit that the standards are virtually identical. Recent, in State v. Daley, Ind., 287 N.E.2d 552 (1972) (Trans. den. November 2, 1972), Judge Buchanan ably reviewed the precedents on this subject under Indiana law and stated:

> "There are cases in Indiana and elsewhere in which large monetary damage awards have been held not to be excessive: Northern Indiana Public Service Co. v. Otis, supra [145 Ind.App. 159, 250 N.E.2d 378] ($235,000 for burns to the body); Kavanagh v. Butorac, supra [140 Ind. App. 139, 221 N.E.2d 824] ($100,000 for loss of an eye); Phegley v. Huffman (Ind.App.1971), 271 N.E.2d 201 ($240,000 for wrongful death); Koninklijke, etc., KLM Royal Dutch Airlines v. Tuller (1961), 110 U.S.App.D. C. 282, 292 F.2d 775 ($350,000 for wrongful death); Compania Dominicana de Aviacion v. Knapp (Fla.App. 1971), 251 So.2d 18 ($1,800,000 for wrongful death of two minor sons); Kaspar v. Clinton-Jackson Corp. (Ill.

App.1969), 254 N.E.2d 826 ($400,000 for bodily injury to a 36-year-old man); United States v. Cline (9th Cir. 1969), 410 F.2d 1337 ($390,000 compensation to wife and children of a wrongful death victim); Young v. Warr (1969) 252 S.C. 179, 165 S.E.2d 797 ($400,000 for permanent paraplegia injury to a 23-year old man); Lebrecht v. Bethlehem Steel Corp. (2d Cir. 1968), 402 F.2d 585 ($590,000 to a 28-year old elevator installer earning $350.00 per month); Mickle v. Blackmon (1969), 252 S.C. 202, 166 S.E.2d 173 ($780,000 for paralysis to a 17-year old girl); Frankel v. United States (D.C.Pa.1970), 321 F.Supp. 1331 ($650,000 for bodily injury to a 19-year old girl); Martin v. Southern Ry. Co. (Tenn.1971), 463 S.W.2d 690 ($350,000 for bodily injury to a 49-year old retired Navy man); Sloma v. Pfluger (1970), 125 Ill.App.2d 347, 261 N.E.2d 323 ($380,000 for permanent bodily injury). We are unable to say that the amount of damages awarded is not within the scope of the evidence before the jury or that the verdict is beyond all reasonable limits of the evidence presented or that these damages are so excessive as to be flagrantly outrageous and extravagant or that the jury was motivated by passion or prejudice. The jury verdict is therefore not excessive."

Likewise, Judge Pell, speaking for the Court of Appeals for the Seventh Circuit, in Galard v. Johnson, 504 F.2d 1198 (1974), recently stated:

> "A motion for a new trial on the ground of inadequate or excessive damages is addressed to the discretion of the trial court. Fronz v. Pennsylvania R.R. Co., 239 F.2d 639, 640 (7th Cir. 1956); Bucher v. Krause, 200 F. 2d 576, 586 (7th Cir. 1952), cert. denied, 345 U.S. 997 [73 S.Ct. 1141, 97 L.Ed. 1404] (1953). To reverse the judgment below, we must conclude that the verdict was so 'gross' or 'monstrously excessive' that the trial

judge abused his discretion in permitting it to stand. Quilter v. Elgin, Joliet & Eastern Ry. Co., 409 F.2d 338, 340 (7th Cir. 1969); Price v. H. B. Green Transp. Line, Inc., 287 F.2d 363, 365 (7th Cir. 1961). As the Second Circuit has noted, '[t]he very nature of the problem .counsels restraint.' Dagnello v. Long Island R.R. Co., 289 F.2d 797, 806 (2d Cir. 1961). Damages assessed by a jury are largely discretionary with it. 'Just as the trial judge is not called upon to say whether the amount is higher than he personally would have awarded, so are we appellate judges not to decide whether we would have set aside the verdict if we were presiding at the trial, but whether the amount is so high that it would be a denial of justice to permit it to stand.' Dagnello v. Long Island R.R. Co., supra at 806; Bucher v. Krause, supra, 200 F.2d at 587." (footnote omitted).

Nowhere in the record is there the slightest intimation that the defendant is asserting that the $50,000.00 verdict for loss of consortium to Nardine Johnson, wife of the plaintiff, Ralph Johnson, was in any way excessive. The award of said damages was recognized by the Supreme Court of Indiana in Troue v. Marker, 253 Ind. 284, 252 N.E. 2d 800 (1969). Likewise, as in Northern Indiana Public Service Company v. Otis, the evidence on the damages for loss of consortium was before the jury without any dispute or contradiction.

Both Ralph Johnson and Nardine Johnson testified in an extended fashion in regard to the physical difficulties, pain and suffering that Ralph Johnson had endured since this collision. There was also evidence of substantial expenses in connection with said injuries. The import of that testimony was that since this collision Ralph Johnson has been in continuous pain and discomfort.

Perhaps the evidence on the personal injury damages of Ralph Johnson can best be summarized by reference to the hypothetical question posed to Dr. Marvin R. Bernard, a treating neurosurgeon:

"Q Now, Doctor, assume a man 52 years of age, who is an Indiana State Trooper, that in January of 1967 he was a Sergeant in the Indiana State Police, employed as a line duty commander; that in that position he had anywhere from ten to fourteen men working under him, and he was required to go out on patrol and to be active in his duties;

And in January of 1967, while he was employed as an Indiana State Trooper, then he injured his back while pushing a stalled motorist in a snowstorm; that following that injury he consulted his family physician who referred him to an orthopedic surgeon, who made a diagnosis that he had sustained a herniated disk at the L5–S1 level; that surgery was performed, a laminectomy was performed in May or April of 1967;

That following the surgery there was a period of post-operative care; the plaintiff continued to experience pain and discomfort; he had a left foot drop, and he was required to wear a brace for a time;

That in October of 1967, he returned to limited duties as an Indiana State Trooper; that in January of '68, he resumed his former duties as a line squadron commander and continued in that capacity until September 25, 1969;

That on September 25, 1969, he was involved in a car-train collision, there he sustained the following injuries: contusion and concussions of the skull, multiple rib fractures, a fracture of the spinous process at C4, a compression fracture of the vertebral body at T6, a fracture of the left scapula;

That immediately after the trauma, then he experienced a grand mal seizure;

· That he was placed in intensive care at the Mercy Hospital in Gary, Indiana, and was hospitalized for a period of some thirty days; that he was followed up by his attending and treating physicians, and that he continued to voice complaints about his leg and his back and his head;

That he had a partial aphasia, that he underwent a personality change in that he was forgetful, he was irritable, he had insomnia, he was short-tempered, and he was unable to articulate well;

That in 1971, he consulted a neurosurgeon with reference to his back and leg pains, who performed a myelogram on him; that the results of the myelogram were negative, but that following the myelogram, he was seen by that neurosurgeon in May and in June, who observed and noted the same complaints that he had voiced prior to the myelogram;

That from that time on he has continued to see his attending and treating physician and has been under pain medication on a constant basis since that time;

That following the car-train collision in September of 1969, he was returned to limited duty in December of 1969, where he was placed in a position where he was a motor vehicle inspector, which was a sedentary type job; that after he was returned to that position, he continued to work on that basis until approximately February or January of 1972, when he was found to be completely disabled to perform any type of duties as an Indiana State Trooper;

That since that time he has not performed any duties as an Indiana State Trooper.

Now, Doctor, do you have an opinion, based upon reasonable medical certainty, as to whether there is or may not be a causal connection between the injuries he sustained in the car-train collision on September 25, 1969, and his present state of ill-being?

A   Yes, I do.

Q   Would you tell the Court and jury what that opinion is, Doctor.

A   Well, it's two-fold. He had an injury to his head which resulted in his inability to choose his words well, to speak well. His memory was pathetically poor. His mentation, in other words, was altered.

And associated with the other aspect of it was his back problem, which I took to be somewhat aggravated.

Q   Now, Doctor, assuming the same set of facts, do you have an opinion as to what degree of impairment—if any, this man has sustained as a result of the car-train collision on September 25, 1969?

A   Yes, I do.

Q   And will you tell the Court and jury what that opinion is, Doctor.

A   Well, that, again, is two-fold. From the point of his back, he has a disability that would make him an inappropriate candidate for any but very sedentary types of jobs, which would make his disability relatively large, but not incompatible with productive living.

However, the manifestations of his thinking, his poor speech, his forgetfulness, his irritability, is irreversible. And at his age and status in life, makes him a very unlikely candidate for anyone to hire for anything but the most meaningless jobs.

Q   Doctor, do you have an opinion, based upon reasonable medical certainty, as to whether this condi-

tion is likely to improve or to deteriorate or remain static?

A That's very difficult to say. I would see no reason to anticipate any improvement. By the same token, I do not see any reason why he should deteriorate any more rapidly than the rest of us.

Q Now, Doctor, during the course of your exposure to this man, did you form any opinion or conclusions as to whether or not he was relating a true experience to you insofar as the manifestation of pain was concerned?

A I don't quite understand what you're asking.

Q All right. Let me put it to you this way, Doctor: Did you ever have the feeling in the course of your examination and treatment of this man that he was malingering?

A No, I never had such a feeling.

Q Did you have difficulty in getting him to relate the experience that he felt?

A He gets tired of repeating himself with the same old symptoms and complaints. And each time that I see him, which is approximately a year apart, he's sort of tired of the whole business. He doesn't go into detail like he did the first time I saw him or the second time. He is—

Q Would you find it necessary to draw him out in order to relate these complaints, Doctor?

A I didn't particularly draw him out, no.

Q Would you describe his personality as stoic?

A It's my feeling that he's the type of individual who does not complain unduly."

All of the above quoted testimony went before the jury without objection.

It would appear that there were two principal thrusts of the plaintiff's damage evidence. The first thrust was that the train collision aggravated a pre-existing low back condition. The second thrust was that the plaintiff, Ralph Johnson, suffered a severe cranial injury resulting in loss of memory and other related personality changes. The defendant dwells almost exclusively on the former and virtually ignores the latter. The Court has carefully reviewed a complete transcript of the examination and cross-examination of Dr. Bernard and the entire emphasis of that cross-examination was on the question of the aggravation of the pre-existing condition.

On redirect examination Dr. Bernard gave the following question and answer:

"Q Is there any question in your mind, Doctor, that he did sustain a major cranial injury?

A Oh, no."

There is evidence from which the jury might properly infer that the major cranial injury sustained by the plaintiff, Ralph Johnson, in this automobile-train collision was primarily the cause of the major disability which Dr. Bernard described.

The defendant objects to the Court's failing to give its tendered Instruction No. 20 which, as tendered, stated:

"If you should find that plaintiff is entitled to recover in this case, his damages are limited to his losses directly caused by this accident. He is not entitled to recover for any loss, injury or disability which was caused by any prior accident or injury.

Therefore, if you find from the evidence that Ralph Johnson was retired from his employment as a State Police Officer because of physical disability incurred from causes other than the accident complained of in this case, he cannot recover from any loss of wages or income which he might have receiv-

ed from his employment as a State Police Officer after such retirement."

The first paragraph of defendant's Instruction No. 20 was given as the Court's Instruction No. 40. The Court also gave its Instruction No. 41 which is an accurate statement of the law on the collateral source rule.[1]

Thus, the jury received a complete and accurate charge on the subject of damages and no error was committed by the failure to give the second paragraph of defendant's Instruction No. 20.

When all of the evidence on the subject of damages to the person of Ralph Johnson, which was before the jury, is considered and weighed, it does not strike this Court, at first blush, as being beyond all measure, unreasonable and outrageous so as to manifestly show that the jury had been actuated by passion, partiality, prejudice or corruption. This Court finds nothing in the evidence that was presented to the jury on the subject of damages in this case to either compel or require this Court to exercise its discretion to grant a new trial.

### IV

The Court gave Instruction No. 17 which states:

"The plaintiffs have alleged that the defendant was negligent in maintaining an extra-hazardous crossing. An extra-hazardous crossing is one which is so peculiarly dangerous that a person in the exercise of ordinary prudence cannot use it with safety. The fact that the defendant was under no statutory duty to install gates, or flashing lights, would not relieve the defendant of liability, if you find the crossing to be extra-hazardous.

It is for you, the Jury, to determine whether or not the crossing in issue was in fact extra-hazardous. In making that determination, you may con-

sider the facts, if you find them to be facts, that there were or were not any warning signals, gates, bells, or flashing lights, together with all other circumstances concerning the crossing, such as obstructions to the view, if any, the nature and gradation of the terrain immediately adjacent to the crossing, the angle at which the tracks intersect the highway, the time of day or night, the speed of the train, the near situation of trees, vegetation and the like, the curves in the track, and the frequency with which travelers pass over the crossing, in order to determine whether or not the crossing was in fact extra-hazardous as I have defined it to you.

If you find by a preponderance of the evidence that the crossing in issue was extra-hazardous and you further find that the defendant knew, or in the exercise of reasonable care should have known, that the crossing was extra-hazardous and you further find that the defendant failed to take effective measures to warn the traveling public, including the plaintiff Ralph Johnson, of the extra-hazardous nature of the crossing, that would constitute evidence of negligence on the part of the defendant. Should you fail to find that the crossing was extra-hazardous, you are not to consider the absence of gates or flashing lights in any manner whatsoever in determining whether or not the defendant was negligent."

■ In its objection made to the instruction at the time of trial and its memorandum filed on October 1, 1974, the defendant contended that it was improper to submit the question of a prior extra-hazardous crossing to the jury in the absence of the finding to that effect by the Public Service Commission of the State of Indiana. The defendant relied

---

1. For a statement of the collateral source under rule see Vol. 9, Indiana Law Encyclopedia, Damages, Sect. 86 and Jackson v. Beard, 146 Ind.App. 382, 255 N.E.2d 837 (1970).

on cases decided prior to Central Indiana Railroad v. Anderson Banking Co., 252 Ind. 270, 247 N.E.2d 208 (1969). On this subject the opinion of Judge Arterburn in Central Indiana Railroad v. Anderson Banking Co., at 252 Ind. 273, 247 N.E. at page 210, represents a correct and accurate statement of the contemporary Indiana law as follows:

"The doctrine prevailing in most jurisdictions, as the later cases show, is that when there is evidence that the particular crossing, either because of its more or less permanent features or because of circumstances existing and affecting its use at a given time, was more than ordinarily hazardous, a question for the jury or the trier of facts is usually presented as to whether or not reasonable care on the part of the railroad required it to provide a flagman to warn of approaching trains.

On the other hand, in the absence of evidence of more than ordinary hazard attending public use of the crossing, there is, according to the doctrine generally laid down, no basis for the contention that the railroad company was under any duty to provide a flagman."

It is also apparent that the United State Court of Appeals for the Seventh Circuit in Hartzler v. Chesapeake and Ohio Railway Co., 433 F.2d 104 (7th Cir. 1970) considers the Central Indiana Railroad v. Anderson Banking Co. case as an authorative statement of the Indiana law.

This same position in regard to the exclusive authority of the Public Service Commission to determine the extra-hazardous nature of a railroad crossing was also asserted in a motion in limine filed by the defendant on August 29, 1974. On this same subject the defendant objects to the Court's failure to give its Instruction No. 25, which, in part, stated:

"There is no evidence in this case that the defendant was negligent in maintaining an extra-hazardous crossing and no evidence that it was negligent in failing to maintain flasher lights or crossing gates at the crossing in question. These contentions therefore, are not to be considered by you in your deliberations in arriving at a verdict."

In a memorandum filed November 22, 1974 the defendant made no mention of their previous position that the subject of extra-hazardous crossing was an exclusive one for the Public Service Commission of Indiana but asserted for the first time in any explicit fashion that instruction 17 contained elements which should have not been considered and declared a semantic war on the instruction. In this instruction the jury was told specifically that it could only consider the absence of flasher lights and gates unless they first found that the crossing was extra-hazardous. In Central Indiana the collision occurred at nighttime, the crossing was at the bottom of a dip in the roadway, there was certain obstructions blocking the view of the crossing, and the crossing was not illuminated in any way. In this case there is a finding that all of these factors are present with the additional factor of the angle at which the tracks intersected the roadway, the elevated hill which could have obstructed the view of oncoming motorists, the thick foliage consisting of trees, weeds and brush, the testimony that the crossing was used extensively and the permissible inference of excessive speed found in the testimony of the plaintiff and in the testimony of the witness Hicks who testified that the conductor told him that after the collision they had to back up two miles.

Defendant's Instruction No. 25 was mandatory and is inconsistent with the law as stated in Central Indiana Railroad and Hartzler.

Based on the record in this case and under the authority of Central Indiana Railroad v. Anderson Banking Co. the question of extra-hazardous crossing

**672**

was properly submitted to the jury in the first instance and the instruction was not erroneous in its treatment of the elements that the jury could and could not consider.[2]

This Court also finds that there is substantial evidence to support the verdicts even in the absence of any theory of extra-hazardous crossing, as outlined in Parts II, V and VI here.

### V

■ The defendant contends that the Court's Instruction No. 32 is erroneous. Said instruction stated:

"You are instructed that at all times in issue, there was a statute of the State of Indiana which was in full force and effect and provided as follows:

'All railroad corporations doing business in this state shall, between the first (1) day of July and the twentieth (20) day of August in each year, cause all noxious weeds growing on land occupied by them in any city, village or township of this state, to be cut down and destroyed.'

If you find that the defendant violated this statute and that such violation proximately contributed to the plaintiff's injuries, such violation would be evidence of negligence on the part of the defendant."

During oral argument on the motion for a new trial the defendant's counsel asserted that it might have been possible to give an instruction regarding the common law duty of the railroad to keep its right of way clear. If that be the fact, it is hard to visualize how the basic idea or thrust of such a common law instruction would be fundamentally any different than Instruction No. 32. The inclusion of the element of proximate cause in Instruction No. 32 cures any of the defendant's objections made to it. There was evidence as to where the boundaries of the defendant's right of way were located at and near this crossing and where the ·weeds and foliage were in relation thereto. There were photographs showing the same including defendant's exhibit G, which taken together with defendant's answers to interrogatories numbers 14, 15 and 16 the jury could have properly inferred that such foliage was on the railroad's right of way. There is also evidence that this was a busy crossing and that there was a rise nearby that could obscure vision down the tracks.

One of the specifications of negligence in the plaintiffs' complaint and pretrial order was the failure to clear its right of way of undergrowth, brush and foliage so that the view of oncoming motorists would not be obstructed. This was a proper and independent specification of negligence. See Wroblewski v. Grand Trunk Western Railway Co., Ind.App., 276 N.E.2d 567 (1971). In *Wroblewski* at page 575 the court stated:

"In addition to the possible negligence arising out of the violation of its statutory duty to install and maintain the Danger Sign there is another reason the Railway was not entitled to a directed verdict. Of the nineteen photographs of the scene introduced into evidence a careful examination of at least four of them lend credence to Mrs. Wroblewski's argument that the Railway was negligent in allowing undergrowth, foliage, and brush to obscure the view of the railroad tracks from Peach Road as the Deceased approached from the south, . . . . Plaintiff's exhibits 17 and 19 particularly could reasonably be interpreted by the jury as showing the Railway negligently allowed such undergrowth,

2. The reasoning and result of the most recent expression from the Court of Appeals of Indiana is in accord with the treatment here. See Indianapolis Union Railway v. Walker, 318 N.E.2d 578, 44 Ind.Dec. 435 (1974). The issue is well covered in Issue One of Judge Lybrook's opinion.

brush, and foliage to accumulate on, or along its right of way, or, if located elsewhere than on its right of way it was negligent in permitting its train to pass a crossing with vision wholly or partially obscured at a high rate of speed (79 miles per hour). Under these conditions there appears to be more than a mere scintilla of evidence on which the jury might reasonably infer negligence on the Railway's part. Reasonable men examining these photographs could differ as to whether the deceased might have avoided colliding with the train had his view of the tracks not been obscured."

Instruction No. 32 was therefore consistent with a specification of negligence which had not been withdrawn from the jury and encompassed the plaintiff's theory in regard thereto. There was substantial evidence to support this theory.

### VI

The defendant contends that the Court erred in giving Court's Instruction No. 33, which reads as follows:

"An act which is performed in violation of a safety statute or regulation is presumptively an act of negligence but that presumption is not conclusive and may be rebutted by showing that the act was justifiable or excusable under the circumstances. Until so rebutted that presumption is conclusive.

Where a person has disobeyed such a statute he may excuse or justify the violation in a civil action for negligence by sustaining the burden of showing that he did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law."

Instruction No. 33 is based upon Davison v. Williams, 251 Ind. 448, 242 N.E. 2d 101 (1968). *Davison* represents the last word and the present law of Indiana

regarding the violation of a safety statute or regulation. Instruction No. 33 was a general instruction, designed to inform the jury of the effect or significance of the violation of the safety stature or regulation. It was designed to refer generally to all such safety statutes and regulations upon which the jury had been instructed.

The precise objection of the defendant to Instruction No. 33 is as follows:

"MR. BLACKMUN: The defendant objects to Instruction No. 33, because this Instruction should only be given with respect to an excuse for violation of the statute when there is evidence of a necessity to violate it or an excuse to violate the statute. In this case, the Court—or if the jury finds that there was a violation of this particular statute—or of a safety statute or regulation, and specifically referring to the violation of the statute requiring the plaintiff to stop not less than ten nor more than fifty feet from the crossing under the stated circumstances as set forth in Instruction No. 25, if the jury would find that the plaintiff violated that statute, there is no evidence upon which they could find an excuse or justification for violating that statute.

THE COURT: For the record, this Instruction was drafted with the precise language of the Supreme Court of Indiana, in Davison v. Williams, 242 N.E.2d 101, 1968."

There was an issue before the jury as to whether or not the train had violated the statute requiring the blowing of the whistle and the ringing of the bell. There was also an issue as to the speed of the train under all of the circumstances prevailing and there was an issue presented by the defendant as to whether the plaintiff had stopped and observed appropriately. All of these involved alleged violations of safety statutes.

Under all of the evidence it was proper under Instruction No. 33 to permit

the jury to determine first, whether there were any violations of any such safety statute or regulation, and, secondly, whether there was any excuse or justification for violation of the statute, if a violation was found in the first instance. Therefore, the Court finds that Instruction No. 33 is a present statement of the Indiana law and the giving of the same constituted no error requiring the granting of a new trial in this case.

## VII

On September 16, 1974 the plaintiffs filed a bill for costs which included as items cost for the deposition of plaintiff, Ralph Johnson, in the sum of $37.20 and $325.00 each for calling Drs. Marvin Bernard and J. J. Gallinatti as witnesses for plaintiffs at the trial on September 20, 1974. Defendant filed objection to the doctor fees and the plaintiff's deposition, asserting the same were not allowable under 28 U.S.C. § 1920. On September 23, 1974 the Court ordered that the cost of the deposition which was not used at the trial not be allowable as costs and the fees for the doctors should be limited to $20.00 to each day's attendance plus mileage. The plaintiffs now seek a reconsideration of this ruling.

Deposition costs are within the discretion of the Court. Bennett Chemical v. Atlantic Commodities, 24 F. R.D. 200 (D.C.N.Y.1959). Deposition costs are not taxable as a matter of right. Pearlman v. Feldmann, 116 F. Supp. 102 (D.C.Conn.1953). This Court chooses to exercise its discretion by excluding from costs this unused deposition.

In support of its efforts to secure additional fees for testifying doctors, the plaintiffs level a constitutional challenge to Burns Ind.Stat. 2–1722, IC 1971 34–1–14–12. This Court will leave that challenge to the Courts of Indiana and let stand this Court's previous order on costs.