Walter QUEBE and Dolores Quebe, Appellants–Defendants,

v.

Billy J. DAVIS, Appellee–Plaintiff.

No. 49A05–9104–CV–129.

Court of Appeals of Indiana, Fifth District.

Feb. 20, 1992.

the state became involved in 1988 when Christi began receiving public assistance. *See supra* note 1.

James N. Scahill, Schnorr, Good & Olvey, Indianapolis, for appellants and defendants.

W.T. Robinette, Indianapolis, for appellee and plaintiff.

BARTEAU, Judge.

"Into each life some rain must fall," wrote Longfellow. When it happened to Billy Davis, it was from a leaky roof, so he sued his landlords, Walter and Dolores Quebe. In a bench trial to construe the parties' lease, the court decided for Davis and awarded him $12,170 in damages and $1,000 in attorney's fees.

The Quebes appeal, arguing the trial court erred by characterizing the work to be done on the decrepit roof as "replacement," chargeable under the lease to the lessors, instead of "repair," chargeable to the lessee. The Quebes further contend the trial judge erred by awarding excessive damages, and by not finding that Davis failed to mitigate damages. We affirm.[1]

## FACTS AND JUDGMENT BELOW

In July, 1986 Walter and Dolores Quebe leased their commercial building at 2949–51 South Meridian in Indianapolis to one Paul Parks. All parties knew the building's roof leaked; the lease obligated Parks to repair the roof to the satisfaction of the Quebes by August 1 of that year. The same paragraph of the lease obligated the Quebes to install a new heating and cooling system, also by August 1, 1986.

In March, 1987 Parks assigned his leasehold to Robert Lloyd and Robert Thomas, who in November, 1988 assigned the leasehold to Billy Davis. Davis, like Lloyd and Thomas before him, used the building for a tavern. The Quebes consented to both assignments.

In October, 1989 Davis sued the Quebes, complaining he had incurred losses occasioned by leaks in the roof, that the roof needed replacement, and that under the lease, such expense fell to the Quebes. They counterclaimed for damages for breach of the lease, arguing that it made Davis responsible for the roof. Trial to the bench was in December, 1990.

Davis testified he was aware the roof leaked when he took over the lease from Lloyd and Thomas. Sometime thereafter, he paid $450 for roof repair by Metro Roofing, a contractor selected by the Quebes. The repair proved unsuccessful, despite four or five return trips by Metro. Thus, over time, a question arose as to whether a leakproof roof could be had through continued patching or only through complete replacement. The dispute here is captured in this exchange from the cross-examination of Davis:

Q. I'm going to hand you [a copy of the lease] and tell me where in that [lease] it says that the landlord is supposed to make the repairs to the roof?

A. Nobody has requested that the landlord make repairs to the roof. I attempted to repair the roof by his contractors that he recommended which could not be repaired, it has to be replaced. Show me where it says I'm supposed to buy the man a new roof.

Record at 140–41. Davis testified he believed the building was erected in 1952, and still had its original roof, although an overlay with a twenty-year life was put down in 1973. Those facts were left uncontradicted by the Quebes. Davis called roofer McGath, who stated his opinion that the roof required replacement.

The record includes documentary evidence in the form of roofers' bids. Of particular interest is an August, 1990 bid from McGath Construction to remove and replace the old roof, and to replace ceiling and carpet, for $12,170, precisely the amount of damages awarded by the trial judge. Other bids were: (1) Metro Roofing's December, 1988 bid of $450 for repair or $2,310 for replacement with a two-ply hot asphalt roof with a ten-year life and guaranteed for two years; (2) Hoop's Roofing's April, 1990 bid stating the existing roof could not be patched, but rather required replacement, and quoting $2,310 for

**1.** We need mention only briefly the Quebes' argument opposing the award of attorney's fees. The lease included a paragraph allowing attorney's fees to the prevailing party in any suit arising from the lease. Neither that provision nor the amount of the attorney's fees award is disputed by the Quebes. Rather, their argument is that the decision below should be reversed, rendering Davis not the prevailing party and therefore not entitled to attorney's fees. Because we affirm, the Quebes' argument fails.

a two-ply reroof guaranteed for four years, or $5,445 for removal of the old roofing and installation of a four-ply roof; and (3) also from April, 1990, a bid from Lawrence Brothers Roofing stating "unable to make repairs," and charging $3,600 for a three-ply reroof guaranteed for one year.

As noted above, the building's address number is 2949–51. Davis explained that 2949 is the half containing his tavern's bar, cooler, kitchen, and lounge area, with seating for thirty. The 2951 part of the building contains a stage and a dance floor, and seating for 120. Davis testified that he abandoned 2951 on April 1, 1989, because continued leakage from the roof made it unusable. However, he continued to pay his full rent, which totalled $25,000 for the period from the abandonment of 2951 to the day of trial.

Walter Quebe testified in support of his counterclaim. His theory was that he and Davis had scrutinized the lease at the time of assignment, that Davis was familiar with provisions therein requiring the lessee to make repairs, and simply put, the lease obligated Davis to tend to the roof.

The trial court decided for Davis, writing "the roof provision of the lease must be assumed to have been complied with on August 1, 1986, and, therefore, [is] not applicable" and "repair and maintenance is different from construction or replacement especially in the case of major structural items and [the Quebes] are responsible for the roof replacement," but that "[Davis's] loss of income is too indefinite to grant loss of income." Record at 48–49. The court then entered a general judgment for Davis in the amounts mentioned above.

### STANDARD OF REVIEW

Neither party requested special findings of fact and conclusions of law under Ind.Trial Rule 52(A). The trial court did not enter any findings of fact, but did enter three conclusions of law, set out above. In such circumstances, "the general finding or judgment will control as to the issues upon which the court has not expressly found, ... and the special findings control only as to those issues which they

cover." *United Farm Bureau Mut. Ins. Co. v. Blanton* (1983), Ind.App., 457 N.E.2d 609, 611. Special findings will be reversed on appeal only if they are clearly erroneous. T.R. 52(A). A general judgment will be affirmed upon any legal theory consistent with the evidence, and this court neither reweighs the evidence nor rejudges the credibility of the witnesses. *Picadilly, Inc. v. Colvin* (1988), Ind., 519 N.E.2d 1217, 1221–22. A "judgment ... shall be reversed upon appeal as not supported by or as contrary to the evidence only when clearly erroneous, and due regard shall be given to the opportunity of the finder of fact to judge the credibility of witnesses." Ind.Appellate Rule 15(N).

### DISCUSSION

To argue that the trial court erred in deciding the lease obligated them to replace the roof, the Quebes rely predominantly on the express provisions of the lease, especially the second paragraph of part four. They cite only one case, *Rene's Restaurant Corp. v. Fro–Du–Co Corp.* (1965), 137 Ind. App. 559, 210 N.E.2d 385, for the idea that in the absence of an express provision to the contrary, a lessor is not bound to repair the leased premises. Because the focus of the Quebes' argument is on the language of the lease, we provide relevant excerpts:

2. SURRENDER AND HOLDOVER

Upon expiration or sooner termination of this Lease Tenant shall surrender to Landlord the Leased Premises, ... in the same order and condition in which Tenant received them, the effects of ordinary wear, acts of God, casualty, insurrection, riot or public disorder excepted....

....

4. ALTERATIONS AND MAINTENANCE OF LEASED PREMISES

[T]he Tenant shall repair the roof of the premises satisfactory to Landlord on or before [August 1], 1986.... Landlord will provide the Leased Premises with Heating and Air Conditioning, ... no later than [August 1], 1986.

Tenant shall make all repairs necessary to maintain the Leased Premises in

the same condition they are now in except for the heating and air conditioning.... Tenant accepts the leased Premises in their present condition. Tenant shall not be obligated under this provision to repair any injury to the Leased Premises resulting from fire or other casualty. The preceding sentence is not intended to limit, modify, or release Tenant from any liability it may have for damage or destruction.

5. DESTRUCTION

If the Leased Premises should be damaged or destroyed by fire or other cause to such an extent that the cost of repair and restoration would exceed thirty (30%) percent [of the replacement cost of the building], then Landlord shall have the right to cancel this Lease....

If the Leased Premises should be damaged or destroyed by fire or other cause to such an extent that the costs of repair and restoration would be less than thirty (30%) percent [of the building's replacement cost], then this Lease shall not terminate and the Landlord shall at its expense promptly repair and restore the Leased Premises to substantially the same condition they were in prior to the damage or destruction.

Record at 106.

The Quebes argue the problems with the roof are covered under the "repairs" language of the second paragraph of part four. Davis argues (1) he met his obligation to repair by hiring Metro Roofing, and that the deterioration of the roof to the point where mere repairs cannot stem its leaks is ordinary wear, chargeable to the Quebes under part two, and (2) if not covered under part two, the replacement of the roof is charged to the Quebes under part five, the lessor's promise to "repair and restore" what has been "damaged or destroyed by fire or other cause." Davis cites *Wabash Ford Truck Sales, Inc. v.*

*Ford Motor Co.* (1984), Ind.App., 472 N.E.2d 611, *trans. denied* to remind us that contracts are construed against the drafter.[2]

The Quebes have not explicitly argued the trial judge erred in ruling that "the roof provision of the lease must be assumed to have been complied with on August 1, 1986, and, therefore, [is] not applicable." However, the Quebes' brief does state several times that the roof was leaking when the original lease was executed. Thus, the issue is raised to some degree, so we will address it. The trial judge was correct. *See Raco Corp. v. Acme–Goodrich, Inc.* (1955), 126 Ind.App. 168, 174, 126 N.E.2d 262, 265, *trans. denied* (1956), 235 Ind. 67, 131 N.E.2d 144 ("[I]t is generally held that an assignee is not liable for breaches occurring prior to the assignment in the absence of an agreement to the contrary and that the assignee, in the absence of a special undertaking, is not liable for an obligation due under the lease before the assignment.") The assignment to Davis simply states "I hereby assume and agree to make all the payments and perform all the covenants, conditions and performance required under the foregoing Lease...." This boilerplate assignment of the lease does not amount to a "special undertaking" to perform an obligation that was to have been performed by the original lessor, more than two years before the assignment to Davis.

Disputes over interpreting a contract are resolved by finding the intent of the parties within the "four corners" of the document. *McCae Management Corp. v. Merchants Nat'l Bank & Trust Co. of Indianapolis* (1990), Ind.App., 553 N.E.2d 884, 887, *trans. denied.* Where the intent of a lessor and lessee are discernible in a lease, the courts will give effect to their intent. *Edward Rose of Indiana v. Fountain* (1982), Ind.App., 431 N.E.2d 543, 546.

---

2. The lease states it was prepared by a named member of a named law firm, the same law firm that represented the Quebes at trial and in this appeal. The lease does not state for whom it was prepared, nor was that question asked at trial. Counsel for Davis assumes the lease was prepared for the Quebes, and not for Parks, the original lessee. Although it seems a reasonable assumption, there is no proof of it in the record. Therefore, we will not employ the rule of construing against the drafter. Also, we direct counsel's attention to Ind.Appellate Rule 8.2(B)(1).

If the language used creates ambiguity, construction of the contract is a question of law. *McCae, supra.* The court must construe a lease to harmonize its provisions. *See id.*

▮ Early on, we described the roof as "decrepit," meaning "weakened by old age, illness, or hard use; 'broken down." It seems an appropriate adjective for an asphalt roof exposed to the blistering sun of some twenty or thirty Augusts, the ice and snow of as many Januarys, and the rainfalls of April upon April. An asphalt roof is not eternal—in the professional opinion of three of four roofers, the roof could no longer be made waterproof through mere patching, but required complete replacement. The one roofer who thought repairs might succeed, failed.

The Quebes appear unwilling to distinguish between "repair" and "replace," arguing vigorously in their reply brief that the lease does not include the word "replace"; quoting a dictionary definition of "repair" to show the word can mean "restoration to a sound or good state after decay, dilapidation, injury, loss, waste, etc."; and quoting *Kritz v. Moon* (1928), 88 Ind.App. 5, 21, 163 N.E. 112, 118 for the idea that "repairs" includes, *inter alia*, "fixing roof," and *Wroblewski v. Grand Trunk W. Ry. Co.* (1971), 150 Ind.App. 327, 342, 276 N.E.2d 567, 576, *trans. denied* for "[r]epair, as opposed to maintain, means to repair or restore to a sound or good state after injury or partial destruction."

We are unpersuaded. Both case quotes are dictum. The *Wroblewski* quote, were it applied here, would be unhelpful to the Quebes, because this was not a case of "injury" or "partial destruction," according to the roofers—the roof could not be sealed by fixing an "injury" or patching over a "partial destruction." Moreover, every argument the Quebes make as to the scope of the word "repair" turns back on them, because part five states the lessor will *"repair and restore"* certain losses. The question becomes whether complete replacement of the roof, made necessary by its deterioration over time, is properly considered a repair under part four, or the remedy of damage or destruction by fire or other cause under part five.

The Quebes argue that part five must be interpreted to apply only to damage caused by a single occurrence. But, we see nothing in the lessor's promises in part five that excludes responsibility for the slow but relentless destruction of the roof by exposure to the elements. Under part five, it can reasonably be said that the roof was "damaged or destroyed" by cause other than fire, namely, inevitable decay, and that consequently the lessor must "repair and restore." Part five unites discussion of 30% of the building's replacement cost with the lessor's obligation, suggesting the parties intended major repairs would fall to the lessor. Thus, the trial court's conclusion that replacement of the roof was the responsibility of the Quebes harmonizes parts four and five. The trial court's judgment of breach by the Quebes is not clearly erroneous and is sustainable on a theory that they breached part five.

The Quebes argue secondly that if the trial court's judgment was based on a theory of implied warranty of habitability, it was error, relying on *Zimmerman v. Moore* (1982), Ind.App., 441 N.E.2d 690, *reh'g denied.* We mention the argument only for the sake of completeness, because our analysis in the preceding paragraphs has rendered it moot. An identical disposition attends the Quebes' third argument, which is but a mirror-image of their first, in that they argue the trial court erred by failing to hold Davis responsible to ameliorate the problems with the roof.

Fourth, the Quebes argue the damages award of $12,170 was excessive, because "it includes damages for repair to the roof which the lessee did not and under the Court's order was not obligated to make" and was more than double the amount of other bids to "repair" the roof. The argument arises from the equivalence of the award and the bid from McGath Construction, from which the Quebes assert "[i]t must therefore be assumed that the Court's award was based upon the estimates of repairs...."

Davis answers that the award compensates for the money he paid to lease an unusable building, that is, it represents roughly half of the $25,500 in rent paid after the April, 1989 abandonment of the 2951 premises. Davis cites *Potts v. Offutt* (1985), Ind.App., 481 N.E.2d 429 for two rules: trial court judgments will be sustained on any theory supported by the evidence, and damages awards need not be ascertainable with any specific degree of certainty, but are affirmed if supported by the evidence and not based on conjecture or speculation. To the shelter of *Potts,* Davis adds the buttress of *Ingmire v. Butts* (1975), 166 Ind.App. 139, 145, 334 N.E.2d 701, 705, that reversal of a damages award as excessive requires an amount "so outrageous as to impress the court as being motivated by passion, prejudice, and partiality."

On those authorities, we affirm the amount of damages. We see the trial court's order as sustainable under a theory of loss of rental value, a theory neatly explained in *Sigsbee v. Swathwood* (1981), Ind.App., 419 N.E.2d 789 and arising here from the abandonment of the dance hall in 2951. Looking at the judgment amount pursuant to such a theory and the evidence regarding Davis's rent payments, we do not see an "outrageous" award motivated by passion or prejudice.

To the Quebes, the trial court's award in the amount of McGath's bid for work that had not been done suggests either that the court below inadvertently omitted ordering Davis to hire McGath to do the job, or that the court mistakenly believed the work had already been done by McGath and paid for by Davis. They argue in their conclusion that Davis deserves at best nominal damages and an order that the Quebes replace the roof. However plausible, those contentions are inadequate to merit reversal, based on the standard of review of general judgments.

It was up to the Quebes to have requested special findings of fact and conclusions of law under Ind.Trial Rule 52(A), or, more to the point, to have expressed to the trial court their perception of error and injustice in the judgment through a motion to correct error under Ind.Trial Rule 59(A). Not having done that, the Quebes now ask us to reverse based on no more than an inference from a coincidence. We decline to do so.

We turn now to the Quebes' final contention, which assumes for the sake of argument that they breached a duty to replace the roof, but asserts that the trial court erred by not finding Davis failed to mitigate damages, quoting *Sigsbee v. Swathwood, supra* for " 'damages for injury to the tenant or his property from continued failure to make repairs cannot ordinarily be recovered because under the rule of avoidable consequences the tenant should have made the repairs himself and recovered their cost from the landlord.' " *Sigsbee,* 419 N.E.2d at 798 (quoting 11 Williston on Contracts § 1404, pp. 563–64 (3d. ed. 1968)). The Quebes provide a second quote from *Sigsbee:* "[t]he lessee can 'not merely continue his occupancy, suffer damage and charge his landlord therewith.' " *Sigsbee,* 419 N.E.2d at 798 (quoting *Olinger v. Reahard* (1947), 117 Ind.App. 172, 174, 70 N.E.2d 436, 436.

The Quebes contend that Davis knew the roof leaked when he assumed the lease, that there was no mildew or rot at that time, that shortly thereafter he received a bid to replace the roof for $2,310, and that by not acting on the bid, he wholly failed to mitigate damages. Therefore, conclude the Quebes, the amounts in the McGath bid attributed to replacement of carpet, ceiling, and electrical should be subtracted from the damages award as consequential damages not occurring within a reasonable time of the Quebes' breach.

Davis counters that he did mitigate, by hiring Metro Roofing to patch the roof, and by replacing portions of the ceiling after Metro's patchwork failed. Moreover, Davis provides this quotation:

'The party injured by the ... breach of a contract is bound to use reasonable exertion and diligence to protect himself from loss ... but where the party whose duty it is to perform has equal opportunity for performance and equal knowledge of consequences of nonperformance he can-

not, while the contract is subsisting, be heard to say that plaintiff might have performed for him.'

*T & W Bldg. Co. v. Merrillville Sport & Fitness, Inc.* (1988), Ind.App., 529 N.E.2d 865, 867, *trans. denied* (quoting 9 I.L.E. Damages § 85 (1981)).

██ As we see things, the Quebes' argument depends on their assumption that the trial court's damages award was meant to pay for the restoration of the premises. Because we are affirming on a lost rental value theory, the Quebes' mitigation argument, as presented, must fail. Moreover, even if we were to read the brief as an argument that the amount of lost rental value would have been reduced if Davis had replaced the roof when 2951 became unusable, we would deem the judgment sustainable under the theory of *T & W Bldg. Co.* In the circumstances here, we think the rule from *T & W Bldg. Co.* more appropriate than that from *Sigsbee*, because the discussion in *Sigsbee* is in terms of minor repairs at "slight expense," such as replacing "a few window panes," not replacing a major component of a building, such as an entire roof. Second, the structural integrity, mechanical engineering, and electrical system of a building are endangered by chronic leakage of its roof. When the building is a rental property, and the lessor and lessee stalemate over who must stop the leak, we think it more reasonable that the lessor, the party with the greater interest, step forward to prevent further deterioration.

AFFIRMED.

RUCKER, J., concurs.

RATLIFF, C.J., concurs in result.