612 N.E.2d 569 (1993)
In the matter of the Adoption of Erica Nicholle Johnson, Infant.
Donald and Jeanette McNicholas, Appellants,
v.
GRETCHEN JOHNSON, Appellee.
No. 73A01-9208-JV-260.
Court of Appeals of Indiana, First District.
April 19, 1993.
Transfer Denied July 20, 1993.
*570 Kenneth J. Falk, Tracy T. Pappas, Legal Services Organization of Indiana, Inc., Indianapolis, Linda Meier, Sargent & Meier, Greenwood, for appellants.
Amy Good, Shelbyville, for guardian ad litem.
ROBERTSON, Judge.
Donald and Jeanette McNicholas appeal the trial court's decision to grant Gretchen Johnson's petition to withdraw her consent to the McNicholases' adoption of Johnson's daughter, Erica. The McNicholases raise three (3) issues which we restate and consolidate into two (2), neither of which constitutes reversible error.

FACTS
The facts in the light most favorable to the trial court's judgment indicate that in March of 1991, Gretchen Johnson was separated from her husband and became pregnant with Erica by another man. In May of 1991, Gretchen and her husband divorced. In August of 1991, the couple reunited. In October of 1991, Gretchen approached the prospective adoptive parents, *571 Donald and Jeanette McNicholas, about adopting the then unborn Erica because Mr. Johnson was not willing to support Erica. Jeanette McNicholas is Mr. Johnson's sister, thus Gretchen and Mrs. McNicholas had been sisters-in-law. Gretchen and Mr. Johnson separated again shortly before the trial in this matter.
Erica was born on December 19, 1991. Jeanette McNicholas was in the delivery room when Erica was born and took Erica home from the hospital. Erica remained in the McNicholases' custody until the completion of the present proceeding at which time she was placed in the custody of the Department of Public Welfare [DPW].
An attorney was consulted who thoroughly explained the process of adoption to Johnson. Johnson executed a consent to adoption in favor of the McNicholases on January 6, 1992. The McNicholases petitioned the court for the adoption of Erica on February 19, 1992.
The trial court appointed a guardian ad litem to represent Erica and ordered the DPW to prepare an adoption report. The DPW prepared an "Adoption Summary" and filed it with the court. This report discloses that Mr. McNicholas is disabled, cannot work outside the home, and is infected with HIV, the virus which causes AIDS [Acquired Immune Deficiency Syndrome]. He has been diagnosed as having AIDS. Mr. McNicholas has suffered from encephalitis. Although the encephalitis is controlled to some extent with medication, McNicholas occasionally experiences tremors or agitation. McNicholas has not yet had any opportunistic infection related to AIDS and is being treated with AZT, a drug which helps "slow the virus." McNicholas takes medication to help him sleep and uses an inhaler to prevent pneumonia.
The Adoption Summary reports that Mrs. McNicholas is also disabled, cannot work outside the home, and is infected with HIV. She also has been diagnosed as having AIDS. In 1988, she contracted a Non-Hodgkins Lymphoma which was treated with chemotherapy and is presently in remission. Mrs. McNicholas does not take AZT because of the side effects. She does use the inhaler to ward off pneumonia.
The DPW caseworker who prepared the Adoption Summary made no recommendation regarding adoption and left the decision to the discretion of the trial court. The caseworker noted however that she was "very concerned" about the McNicholases' health and indicated that their doctor believed that they would develop "full-blown AIDS" in the next year or two at which time they would no longer be able to take care of Erica. The caseworker concluded:
At this time Erica is probably the best medicine that Mr. and Mrs. McNicholas receive. However, the best interest of the child needs to be determined at this time.
A final hearing was scheduled for May 20, 1992. However, before the hearing, the trial court received a letter from Johnson in which she expressed her concerns about the prospective adoption and requested the court not to permit the McNicholases to adopt Erica. Johnson has never been represented by counsel.
At the beginning of the hearing, the trial judge stated that he had received a letter from Johnson and that he had learned some things from the guardian ad litem. The judge stated that he wanted to hear evidence about these matters. The trial judge conducted the direct examination of Johnson. Johnson supplied very little evidence in support of her request that her consent to the adoption be withdrawn. She did testify cryptically to the effect that she feared that the McNicholases' HIV infection would leave Erica without parents which "would be emotionally bad on her." She testified further: "It wouldn't be as hard on her now as if it happens later, such as losing them." Under questioning by the McNicholases' attorney, Johnson reiterated: "I feel that it would be hard on her to, to lose her parents... ."
The guardian ad litem recommended against adoption. The trial court granted Johnson's request to withdraw her consent and remanded Erica into the custody of the *572 Department of Public Welfare. She has been placed in foster care.
Johnson remains without counsel. The guardian ad litem (and not Johnson) filed the red "appellees'" brief in this matter. On appeal, the McNicholases are represented not only by private counsel, but also by the HIV/AIDS Legal Project of the Legal Services Organization of Indiana, Inc.

DECISION

I.
For simplicity, we combine the McNicholases' first and third issues which read:
1. Did the trial court improperly receive and utilize ex parte communications to decide the issue before the Court.
3. Did the trial judge act in an impartial and unbiased manner given the ex parte communications, improper questioning of a witness, and evidence of a predetermined outcome.
The law presumes that a judge is unbiased and unprejudiced. Jaske v. State (1990), Ind. App., 553 N.E.2d 181, trans. denied. Judges are credited with the ability to remain objective notwithstanding their having been exposed to information which might tend to prejudice lay persons. Id. A judge's personal knowledge acquired through extra judicial sources requires recusal. Stivers v. Knox County Department of Welfare (1985), Ind. App., 482 N.E.2d 748. However, the type of personal knowledge which requires recusal is knowledge acquired from extrajudicial sources, not what the judge learned from his participation in the case. Jones v. State (1981), Ind. App., 416 N.E.2d 880. In order to preserve error based upon alleged trial judge bias resulting from his having engaged in improper extrajudicial communications, the complaining party must request the judge to recuse himself. Hobson v. State (1984), Ind., 471 N.E.2d 281.
While a trial judge may not assume an adversarial role, he or she may intervene in the fact-finding process and question witnesses in order to promote clarity or dispel obscurity. Isaac v. State (1992), Ind., 605 N.E.2d 144. The trial judge may appropriately question witnesses in order to permit the development of the truth or present facts which may have been overlooked by the parties. Id. The questioning of witnesses by the trial judge is a matter within the trial judge's discretion as long as the questioning is conducted in an impartial manner and no prejudice results from the questioning. Id. Even in a case tried by jury, the trial court may direct questions to the witness as long as it is done in an impartial manner. McManus v. State (1982), Ind., 433 N.E.2d 775.
In Isaac, 605 N.E.2d 144, a petition to revoke Isaac's probation had been filed. But, on the day of the hearing, the prosecutor moved to dismiss the action and declined to present evidence. Id. The trial judge 1) denied the prosecutor's motion to dismiss, 2) called Isaac's probation officer to the witness stand, 3) questioned the probation officer eliciting evidence that Isaac had violated the terms of his probation, and 4) revoked Issac's probation. Id. Our supreme court affirmed the trial judge's actions holding:
where the matter being decided is immediately within the knowledge or view of the judge or his officers, due process permits the judge to deal more directly with the matter than would be the case if the events under consideration occurred farther away from the judge's purview.
605 N.E.2d at 148.
We perceive that the procedural irregularities about which the McNicholases complain resulted, at least in large part, from the fact that Johnson was not represented by counsel. For example, rather than writing an ex parte letter to the judge, Johnson, through counsel, could have filed an appropriate pleading with the court. The McNicholases would appear to share this perception as they assert in their brief that the trial judge should have appointed independent counsel for Johnson rather than conducting the examination of Johnson himself. The McNicholases point out that Johnson had a right to be represented by counsel under the present circumstances, citing Taylor v. State (1991), Ind. App., 570 *573 N.E.2d 1333, trans. denied. We would simply note that if the McNicholases truly wished for Johnson to be represented by counsel in the present proceedings, they might have taken it upon themselves to move the court to make such an appointment.
The McNicholases never requested the judge to appoint counsel for Johnson, nor did they request the judge to recuse himself. The personal knowledge the judge obtained ex parte was in conjunction with his participation in the case and does not mandate recusal. Jones, 416 N.E.2d 880.
From a careful examination of the transcript, we cannot discern that the judge harbored prejudice against the McNicholases. Considering that Johnson was not represented by counsel, we cannot find any fault in the trial court's examination of Johnson during the hearing. The McNicholases were given every opportunity to present their evidence and make their case before the trial court rendered its decision.
In the present case, the matter being decided was within the immediate knowledge of the trial judge and his officers. The welfare department caseworker had filed her report with the court. The court appointed guardian ad litem had assessed the situation and had communicated with the trial judge. Therefore, we can discern no violation of due process or reversible error resulting from the manner in which the trial judge conducted this most difficult case. See, Isaac, 605 N.E.2d 144.

II.

Whether the trial court erred by permitting Johnson to withdraw her consent?
Indiana Code 31-3-1-6(f) reads in pertinent part as follows:
A consent to adoption may not be withdrawn prior to the entry of the decree of adoption unless the court finds, after notice and opportunity to be heard afforded to the petitioner, the person seeking the withdrawal is acting in the best interest of the person sought to be adopted and the court orders the withdrawal.
When a mother petitions to withdraw her consent to the adoption of her child, she has the burden of establishing that she is acting in the best interest of the child. Matter of Adoption of Hewitt (1979), Ind. App., 396 N.E.2d 938.
In the present case, neither party requested the trial court to enter specific findings of fact pursuant to Ind. Trial Rule 52. In such a case, a general finding or judgment will control as to issues upon which the trial court has not expressly found, and special findings will control only as to those issues which they cover. Quebe v. Davis (1992), Ind., 586 N.E.2d 914. Special findings will be reversed on appeal only if they are clearly erroneous. Id. A general judgment will be affirmed upon any legal theory consistent with the evidence, and the court of review neither reweighs the evidence nor rejudges the credibility of the witnesses. Id. Moreover, when reviewing a general judgment, we presume that the trial court correctly followed the law. Turpen v. Turpen (1989), Ind. App., 537 N.E.2d 537. The presumption that the trial court correctly followed the law is one of the strongest presumptions applicable to our consideration of a case on appeal. Baker v. Baker (1986), Ind. App., 488 N.E.2d 361.
The McNicholases' prognosis is grim; they are expected to develop full-blown AIDS in the next year or two at which time they will be unable to care for Erica. Johnson testified, in effect, that it would not be in Erica's best interests to be adopted and then orphaned.
We empathize with the McNicholases and regret that their tragic situation has been compounded by the loss of their beloved Erica. However, we must agree with the DPW caseworker in her report as set out above, the paramount concern in these proceedings is the best interest of Erica. Under the circumstances, we cannot conclude that the trial court erred in determining that Johnson's withdrawal of her consent is in Erica's best interest. Therefore, we find no error.
Judgment affirmed.
*574 BAKER, J., concurs.
SHARPNACK, C.J., dissents with separate opinion.
SHARPNACK, Chief Judge, dissenting.
I concur in result with the majority as to issue one and respectfully dissent as to issue two.
In March of 1991, Gretchen Johnson ("Mother") became pregnant with Erica as a result of a relationship she had with a man other than her husband. In May of 1991, Mother and her husband, Mr. Johnson, divorced. In August of 1991, the two physically reunited, however, and, in October of 1991, Mother approached the prospective adoptive parents, Donald and Jeannette McNicholas, about adopting then unborn Erica.[1] While Mr. Johnson had agreed to support Mother and their two children, Mr. Johnson had refused to support Erica.
On December 19, 1991, Erica was born. Mrs. McNicholas was in the delivery room during birth, was the first to feed Erica and stayed at the hospital with Erica until Erica went home with the McNicholases two days later. On January 6, 1992, Mother executed a consent to adopt in favor of the McNicholases. On February 19, 1992, the McNicholases filed their petition to adopt Erica. On February 20, the court forwarded a copy of the McNicholases' petition to adopt to the State Department of Welfare and the Shelby County Department of Public Welfare for an investigation and a report.
On March 22, 1992, Mother wrote a letter to the trial court asking the court to allow her to withdraw her consent to Erica's adoption. According to the letter, Erica was in a dangerous situation and Mother wanted her to be returned either to herself or to her grandmother.
On April 24, 1992, Debbie Ericson, an "adoption/custody specialist" for the Shelby County Department of Public Welfare, filed an "adoption summary" with the trial court. In her report, Ericson stated:
"Their physician of 5 years finds the McNicholases to be genuinely compassionate people, and would be capable of providing a good home for a child. However, their health problems are a major concern. Although they are stable now, it would not be surprising if one or both of them developed a significant complication from AIDS in the next 1-2 years. He understands that backup plans have been made with extended family, and this is mandatory should one or both of them become sick. He adds that it is difficult to predict how they will do over the next 1-2 years. He has no doubt they will provide a good home environment as do other parents with AIDS. He recommends this adoption with some reservation."
(Record, p. 24.)
In the evaluation and recommendation portion of her report, Ms. Ericson concluded:
"Although Mr. and Mrs. McNicholas appear to be very good parents, this worker is very concerned about their health. They are both HIV + and carry the AIDS virus. Mr. McNicholas probably contracted the virus in 1984 through blood transfusions during open heart surgery. It was determined that Mrs. McNicholas was HIV + in 1988 after she developed Lymphoma. This worker understands that the average time a person is HIV + before developing full-blown AIDS is about 10 years. Noone can predict when this might occur, but their doctor indicates that it could be in the next 1-2 years. If and when this should occur, it is doubtful that they will be able to care for Erica. The McNicholases do have back-up plans for Erica. This includes Jason, Mrs. McNicholas' 18 year old son, or her sister that resides next door. They relate that Erica is loved by all of them and will never be without a home.
This worker sees Mr. and Mrs. McNicholas as very capable of caring for and *575 providing for Erica  at this time. However, this worker is very concerned about the future. In the next couple of years Erica will know and remember Mr. and Mrs. McNicholas as her parents should the adoption be finalized. If they should develop full-blown AIDS she will witness much pain and suffering. This worker feels that this would be a very traumatic experience for her. Granted there would be others to care for her, but she would be old enough to ask for and realize she is being kept away from her parents. At this time Erica is probably the best medicine that Mr. and Mrs. McNicholas receive. However, the best interest of the child needs to be determined at this time.
This worker makes no recommendation and leaves the decision to the discretion of the Court."
(Supplemental Record, p. 1; Record, p. 24)
On May 4, 1992, the trial court ordered Mother to appear at the final hearing on the McNicholases' petition to adopt, which was set for May 20. On May 15, Mother and Mr. Johnson stopped living together and, on the date of the hearing, Mother was living with her mother. At the hearing on May 20, the trial court began by addressing Mother's request to withdraw her consent to Erica's adoption, of which the McNicholases had been notified.
At the hearing, Mother was the only party to testify. She stated that she and her husband were divorced and no longer living together and that, at the time that she had signed the consent to adopt, she was confused, unemployed and not sure that she would be able to care for Erica. One of the reasons that she desired to withdraw her consent was because she now believed that she could support Erica. Another reason was because the present situation was very confusing, problematic and painful for her other two children.
Mother testified that, at the time she consented to Erica's adoption by the McNicholases, she was aware of the McNicholases' health problems. However, she did not know what they have, did not know how it progresses and did not know "what all illness it involves." (Record, p. 78.) Mother testified that she was not aware of what the illness was like, but felt it would be emotionally detrimental for Erica should something happen to the McNicholases and Erica be left without parents. While she did not fear that Erica would become infected with the AIDS virus, she did not want Erica to experience the McNicholases' illness.
At the close of the hearing, the trial judge stated:
"All right. Thank you. I ... see the matter this way, I certainly agree with much that [the McNicholases' attorney] has ... argued here... . [C]ertainly the consent by [Mother] was made voluntarily and there's no ... evidence to suggest that ... it was done under duress or on any type of involuntary basis... . I think in addition to the statute, I need to consider and put a great deal of emphasis on ... the ... high priority that the law gives to the rights of the natural parent... . I am going to allow [Mother] to withdraw her consent in this matter because I think that it is in the best interests of ... Erica. It's certainly ... a difficult situation for you, Mr. and Mrs. McNicholas and I acknowledge that... . I'm sure that whatever I say to you here is not going to be ... enough or soothing to your situation... . I would suggest to you that ... the posture we're in right now is somewhat unknown... . I anticipate ... immediately after this hearing, having a[n] ... emergency detention hearing and ... placing Erica .. . as a ... temporary ward of the ... Welfare Department ... to ... help me determine what the ultimate ... placement and resolution of Erica should be... . [C]ertainly this is a difficult situation given your illness. And ... I don't think there is any way ... to avoid that, and ... I think I need to address that head on. Had I not allowed ... [Mother] to withdraw her consent today,... then it would have been my decision as ... to whether the adoption should have been approved. And .. . I'm not, I've told the lawyer this, ... I do not know how I would have ... decided that issue. I would have needed to hear the medical *576 evidence and .. . that would have played a large role in ... deciding that issue."
(Record, pp. 128-130.)
On May 22, the trial court issued special findings and a judgment granting Mother's petition to adopt Erica and denying the McNicholases' petition to adopt.
As to issue one, concerning whether the trial court erred by questioning Mother at the hearing, I concur in the result reached by the majority but not for the reasons stated by the majority. The majority infers that the trial judge had immediate knowledge of the matter before it from the fact that the welfare department caseworker had filed an adoption report with the court and that the court appointed guardian ad litem had assessed the situation and had communicated that assessment to the trial judge. (Majority opinion, p. 8.)
First, while it is true that the caseworker had filed an adoption summary with the court, there is no indication from the record that the trial judge read this report nor is there any indication that this report was introduced into evidence at the hearing. Second, while the trial judge did twice refer to the guardian ad litem at the hearing, the judge did not indicate that the guardian had "assessed" the situation, precisely what any such assessment was, or that the guardian had communicated any such assessment to him. The two references made at the hearing by the judge concerning the guardian read as follows:
(At the very beginning of the hearing:) "Uh, Mrs. Johnson I want to make you aware of my position on the case and I've learned, uh, some things about the case through, uh, uh, our Guardian Ad Litem here and of course I will be very interested in the testimony today." (Record, p. 61.)
* * * * * *
(At the very end of the hearing, after the judge had rendered his decision and was talking to the McNicholases about picking Erica up later that day:) "Okay. Just a couple other issues I want to address with your folks as well. There's certainly been no evidence of this, however, I've heard of this through, through, uh, basically the Guardian Ad Litem, and she's been in contact with, with, uh, all the parties here. Um, please don't take me wrong when I say this, I'm only interested in Erica's welfare. Number one, of course, we don't want anything to, to happen to Erica ... and you know what I'm talkin' about." (Record, p. 133.)
In the first reference to the guardian, the trial judge only states that he had learned "some things" about the case from the guardian ad litem. The trial judge does not further explain what the "some things" were. While it is a bit vague from the record just what the trial judge is talking about in the second reference to the guardian, that discussion appears to pertain to threats allegedly made by the McNicholases. Mr. McNicholas responded to the court here by stating that no threats had been made, that nothing would happen to Erica, and that Erica's welfare came first.
In sum, because there is no indication that the trial judge read the caseworker's report, because the caseworker's report was not introduced as evidence during the hearing, and because there is no indication that the guardian "assessed" the situation and subsequently related her assessment to the judge, I cannot agree with the majority's conclusion that this information provided the trial judge with immediate knowledge of the matter being decided.
Rather, in my opinion, the trial judge did not err by intervening and questioning Mother at the hearing because, by calling and questioning Mother in this situation, the trial judge did not abandon his role as neutral fact finder. The questions asked by the judge were straight forward and clearly intended to develop the truth as well as ascertain the facts. The questions were designed simply to determine the basis for Mother's desire to withdraw her consent to adopt. The record indicates nothing in the questioning to suggest the judge was anything but impartial. Here, the trial judge was not transformed into Mother's advocate simply by calling and asking questions of Mother to determine the underlying basis for her desire to withdraw *577 her consent to adopt. See Isaac v. State (1992), Ind., 605 N.E.2d 144, 148-149.
For these reasons, I concur in the result reached by the majority, which is that no fault can be found in the trial judge's examination of Mother during the hearing.
As for issue two, concerning whether the trial court erred by permitting Mother to withdraw her consent, I respectfully dissent for the following reasons.
Pursuant to Ind. Code § 31-3-1-6(f), "[a] consent to adoption may not be withdrawn prior to the entry of the decree of adoption unless the court finds, after notice and opportunity to be heard afforded to the petitioner, the person seeking the withdrawal is acting in the best interest of the person sought to be adopted and the court orders the withdrawal."
In Rhodes v. Shirley (1955), 234 Ind. 587, 129 N.E.2d 60, our supreme court decided the issue of whether natural parents have the absolute right to revoke their consent to adopt at any time prior to the decree of adoption. In holding that they did not, the Rhodes court stated:
"We do not construe our statutes as implying an intention that natural parents, having consented to the adoption of their children, have a right to arbitrarily revoke that consent at any time prior to the final decree of adoption. Neither does reason dictate such a rule. On the contrary, if such a rule were followed there would be no purpose in obtaining a consent prior to the placement of children and the subsequent supervisory period, all of which, under our procedure, ordinarily precedes the actual adoption proceedings."
Rhodes, 234 Ind. at 596, 129 N.E.2d at 64.
Following Rhodes, to the extent that the trial court considered Mother's superior rights as a natural parent in determining that Mother should be allowed to withdraw her voluntary consent to adopt, the trial court erred. The fact that the trial court did consider this fact in reaching its decision is evidenced by the court's following statement, made after the hearing on Mother's request to withdraw consent: "[C]ertainly the consent by [Mother] was made voluntarily and there's no ... evidence to suggest that ... it was done under duress or on any type of involuntary basis... . I think in addition to the statute, I need to consider and put a great deal of emphasis on ... the ... high priority that the law gives to the rights of the natural parent... ." (Record, p. 128.)
Next, I address the trial court's finding that it was in Erica's best interests to allow Mother to withdraw her consent. In In re Adoption of Hewitt (1979), Ind. App., 396 N.E.2d 938, a mother executed a consent for adoption of her child two days after the child was born. The adopting parents filed a petition to adopt and, pursuant to that petition, received temporary custody of the child. Id. Ten days later, mother filed a petition to withdraw her consent claiming a change in circumstances and, as a natural mother, a better ability to raise the child. Id. Following a hearing, the trial court denied mother's petition and granted the adopting parents' petition to adopt. Id. Mother appealed, arguing in part that there was insufficient evidence to establish that it was in the best interests of the child to deny her petition to withdraw her consent. Id. (Noting that Mother appealed from a negative judgment and that an allegation of insufficient evidence failed to present an appealable issue, the appellate court nevertheless considered the merits of Mother's argument due to the sensitive nature of the case.)
In affirming the trial court's decision, the appellate court stated:
"The trial judge must recognize there are three parties whose interests and feelings are involved in the adoption process and all must be treated fairly. That judge must balance the interest of the natural parents and their sacred relationship to their child against the hope, expectation, reliances, and desires of the adoptive parents  all against the best interest of the child which, after all, rules supreme.

The trial court had evidence before it as to the present circumstance of the Natural Mother and the Adoptive Parents. The trial judge also had the opportunity *578 to observe and judge the credibility, demeanor, and maturity of these respective parties. Upon his shoulders fell the awesome responsibility of determining what was, in fact, in the best interest of the child."
Hewitt, 396 N.E.2d at 942. (emphasis added) The Hewitt court made no distinction between acting in the best interest of the child and being in the best interest of the child.
At the final hearing on the McNicholases' petition to adopt and Mother's petition to withdraw her consent, Mother was the only party to testify. During cross-examination, Mother responded to questions from counsel for the McNicholases as follows:
Q: Is there any other concern regarding Erica other than the confusion of your daughter?
A: You mean Erica's ones besides her?
Q: Uh-huh.
A: Yes, they could, um the impact that it's had on me and the impact it's had on Erica.
Q: Uh, have, what impact has it had on Erica? That's what I, it's very difficult 
A: It hasn't, I mean, not the impact that it's had yet, but if something should happen to them.
Q: Okay. Uh, that's something in the future you mean?
A: Yes.
Q: Okay. Is it, do you have any doubt concerning [the McNicholases'] ability as parents?
A: No.
Q: Their loving nature of your child? How much 
A: The child's loved I know that. Yes.
Q: And they care for her?
A: Yes.
Q: You have no concerns about that whatsoever?
A: No. I feel that she's loved. Yes.
Q: And their ability to be parents. You have no concern over that do you?
A: No ...
(Record, pp. 102-103.)
Following Mother's testimony, the following exchange took place between the McNicholases' attorney and the trial court:
MR. SARGENT: Your Honor, it would probably be cumulative, does the Court wish any testimony from the adoptive parents at this time regarding the issues of the consent?
JUDGE: I don't, I don't think it would be honestly, honestly would be helpful to the decision here.
(Record, p. 119.)
With that, and following counsel's closing argument, the hearing was concluded. The court took no evidence either from the McNicholases concerning their ability to care for Erica or from the McNicholases' doctor about the McNicholases' ability to care for Erica.
Here, neither party requested special findings of fact and conclusions of law under Ind. Trial Rule 52(A). Nevertheless, the trial court entered findings, five of which are findings of fact and one of which is actually a conclusion of law. In such circumstances, the general finding or judgment will control as to the issues upon which the court has not expressly found and the special findings control only as to those issues which they cover. Quebe v. Davis (1992), Ind. App., 586 N.E.2d 914, 917. We will affirm a general judgment upon any legal theory consistent with the evidence, and we will neither reweigh the evidence nor rejudge the credibility of the witnesses. Id. We will reverse special findings only if the findings are clearly erroneous. Id. Findings are not clearly erroneous if they are sufficient to disclose a valid basis under the issues for the legal result reached in the judgment and are supported by evidence of probative value. Hacienda Mexican Restaurant of Kalamazoo Corp. v. Hacienda Franchise Group, Inc. (1991), Ind. App., 569 N.E.2d 661. Conclusions of law are "clearly erroneous" if unsupported by the findings of fact. Remonstrators Below v. City of Fort Wayne (1991), Ind. App., 571 N.E.2d 1312.
*579 Following the hearing in our case, the trial court issued the following special findings and judgment following the hearing:
"The Court, having previously received a letter from the natural mother requesting she be allowed to withdraw her consent for adoption ... now finds as follows:
1. [Mother] ... on January 6, 1992, consented to the adoption of her daughter Erica Nicholle Johnson by the Petitioners Jeannette and Donald McNicholas.
2. The consent of [Mother] was made freely, voluntarily and without duress or fraud. [Mother] was fully advised of the ramifications of her consent.
3. [Mother] came to question her decision of consent and wrote a letter to the Court dated March 22, 1992, indicating she wished to withdraw her consent.
4. [Mother] wishes to withdraw her consent to the adoption out of concern for her daughter Erica.
5. [Mother's] concern relates generally to Erica becoming an adopted child and specifically to the ability of the proposed adoptive parents to physically care for Erica.
6. The Court finds that it is in Erica's best interests that [Mother] be allowed to withdraw her consent to the adoption of Erica by the Petitioners.
Therefore, the Court grants the petition of [Mother] to withdraw her consent to the adoption of Erica Johnson sought by Petitioners Donald McNicholas and Jeannette McNicholas. Further, the Court denies the Petition for Adoption."[2]
(Record, p. 29.)
The trial court's special finding (or conclusion) # 6 controls as to the issue of whether it is in Erica's best interest to allow Mother to withdraw her consent. Given our standard of review, we may reverse this conclusion only if it is clearly erroneous. By statute, there is only one valid basis (the best interests of Erica) upon which the trial court may have based the legal result it reached in its judgment (that Mother should be allowed to withdraw her consent). While the court's finding # 6 sufficiently discloses that basis, the finding is not supported by evidence of probative value.
With the exception of Mother's concern about the McNicholases' health problems, Mother's reasons for desiring to withdraw her consent to adopt here are so common as to vitiate the requirement of the withdrawal being in the best interests of the child. The court's findings to support the conclusion that withdrawal of Mother's consent is in Erica's best interest address only Mother's concern. The hearing held here was unquestionably adversarial in nature, yet there is no indication in the record that the Department of Public Welfare's report was either taken as evidence or even read by the judge. Furthermore, there is a total absence of credible medical evidence concerning either the McNicholases' present health condition or their future prognosis. While the majority states that Erica's guardian ad litem had assessed the situation, the record is void of any report, assessment or testimony by the guardian. The only evidence introduced at the hearing concerning the McNicholases' health problems was Mother's testimony, wherein she stated that she did not know what illness the McNicholases had, did not know how their illness would progress, did not know what all the illness involved, and was not aware of what the illness was like.
Furthermore, findings of fact # 1 through # 5 do not support conclusion # 6. While one may argue that the second half of finding # 5, (that Mother was concerned about the ability of the McNicholases to physically care for Erica), could support conclusion # 6, the transcript of the hearing contains no evidence, much less evidence of probative value, concerning the McNicholases' inability to physically care for Erica. Rather, the only evidence introduced at the hearing concerning the McNicholases' *580 ability to care for Erica came from Mother's own testimony, wherein she stated that she had no concern about the McNicholases' ability to be parents. (Record, pp. 102-103.) Because the second half of finding # 5 is not supported by evidence of probative value, it cannot support conclusion # 6.
In conclusion, to allow a parent to withdraw consent to adopt, the trial court must find that the parent is acting in the best interest of the person sought to be adopted. I.C. § 31-3-1-6(f). To grant a petition to adopt, the trial court must find, among other things, that the adoption prayed for is in the best interest of the child. I.C. § 31-3-1-8(a)(1). According to Hewitt, there is no distinction between acting in the best interest of the child and being in the best interest of the child. The trial court's decision here, however, makes a distinction because the court has allowed a natural parent to withdraw her consent based on less evidence than the court would have required to establish that the adoption petition should be denied. This is apparent from the trial court's statement that, had the court not allowed Mother to withdraw her consent, the trial court would have taken medical evidence on the issue, which evidence would have played a large role in deciding whether the McNicholases should be allowed to adopt Erica.
The evidence in the record leads to the conclusion that the McNicholases are presently capable of caring for Erica. Except for the aforementioned adoption report, the record is void of any evidence whatsoever concerning the McNicholases' future ability to care for Erica. For that reason, I would reverse the judgment permitting Mother to withdraw her consent and remand to the trial court for it to conduct a hearing and take evidence on whether adoption by the McNicholases is in the best interest of Erica.
NOTES
[1] Jeanette McNicholas is Mr. Johnson's sister thus Mother and Ms. McNicholas were once sisters-in-law.
[2] Once the trial court permitted Mother to withdraw her consent to adopt, the trial court may not have considered whether adoption was in Erica's best interest until one of the grounds set out in I.C. § 31-3-1-6(g) for dispensing with parental consent had been proven. See In re Adoption of Augustyniak (1987), Ind. App., 505 N.E.2d 868.