**In re WINDMILL ENVIRONMENTAL SERVICES, LLC, Debtor.**

**No. 06–60075 JPK.**

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

Jan. 17, 2008.

Bruce de'Medici, Mandell, Menkes & Surdyk LLC, Chicago, IL, for Debtor.

*MEMORANDUM OF DECISION AND
ORDER CONCERNING MOTION
FOR AUTHORITY TO SELL CER-
TAIN ASSETS*

J. PHILIP KLINGEBERGER,
Bankruptcy Judge.

On May 30, 2007, Windmill Environmental Services, LLC ("Windmill"), as the debtor-in-possession in this Chapter 11 case, filed a Motion for Authority to Sell Certain Assets. This motion was promptly attacked by Windmill's principal creditor, the Estate of George B. Holmes ("Estate"), which filed its Objection to Debtors' Motion for Authority to Sell Certain Assets, and Request for Immediate Telephonic Hearing on June 6, 2007. Cannonades were lobbed back and forth between the parties, including the Debtor's Motion for Sanctions Under Fed.R.Civ.P. 11 and Fed.R.Bankr.P. 9011 filed on July 9, 2007 and the Estate of George B. Holmes' Response to Motion for Sanctions Under Fed. R.Civ.P. 11 and Fed.R.Bankr.P. 9011 filed on July 24, 2007. The Rule 9011 motion is addressed to the Estate's objection to the sales motion, and because of the interrelationship between these two contested matters, the Court will address both in this decision.

 The Court has subject matter jurisdiction of both of the foregoing contested matters pursuant to 28 U.S.C. § 1334(a) and (b), pursuant to 28 U.S.C. § 157(a) and (b), and pursuant to N.D.Ind.L.R. 200.1(a). The contested matter concerning the sales motion is a core proceeding under 28 U.S.C. § 157(b)(2)(N), and the Rule 11 contested matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

I. *RECORD OF PROCEEDINGS*

The contested matter concerning the sales motion was initiated by Windmill's Motion for Authority to Sell Certain As-

sets, filed on May 30, 2007, to which the Estate responded by filing its objection to that motion on June 6, 2007, to which Windmill responded by its Debtor's Response to Objection of the Estate of George B. Holmes to the Debtor's Motion for Authority to Sell Certain Assets. and Request for Immediate Telephonic Hearing filed on June 8, 2007. Other documents were filed by each of the parties in relation to procedural skirmishes prior to engagement in battle over the sales motion; however, the Court does not deem it necessary to designate these documents for the purposes of stating the status of the record.

The contested matter concerning the Rule 11 motion arose from the Debtor's Motion for Sanctions Under Fed.R.Civ.P. 11 and Fed.R.Bankr.P. 9011 filed on July 9, 2007 and the Estate's response to that motion filed on July 24, 2007.

On July 9, 2007, the Court held a hearing which addressed, in addition to other matters pending between Windmill and the Estate, the manner in which further proceedings would be held with respect to the two contested matters. This order required the parties to file a pre-trial order, which was filed on July 23, 2007. The order also scheduled an evidentiary hearing for July 27, 2007.

At the July 27 hearing, the parties determined that the two contested matters would be submitted to the Court on essentially a stipulated record, which will be set out in the succeeding section of this decision.

II. *DESIGNATION OF FACTS*

The factual record was provided by the parties' stipulation at the July 27, 2007 hearing as to the record to be considered by the Court with respect to the Estate's objection to the sales motion. The objection is focused upon the contention that

certain of the property sought to be sold by means of the motion is not property of Windmill's bankruptcy estate.

The documentary exhibits to be considered by the Court are the following:

1. Windmill's Trial Exhibit #1 ("Agreement and Plan of Reorganization, among U S Liquids of Illinois, Inc., and D & H Holding Company, Inc., and George B. Holmes, Ronald L. Holmes, George H. Holmes, and the James Holmes Irrevocable Trust");

2. Windmill's Exhibit #2 ("Agreement of Lease" dated October 30, 1998, entered into between George B. Holmes as landlord and U S Liquids of Illinois, Inc. as tenant);

3. Windmill's Exhibit #16 (entitled "Liquidation Value of Plant and Processing Equipment [Fifth Third Bank]");

4. The Estate's Exhibit #3 ("Agreement to Terminate Lease" dated October 30, 1998 between George B. Holmes as landlord and Dombrowski & Holmes, Inc. as tenant); and

5. The Estate's Exhibit #4 (a two-page document comprised of a letter dated December 14, 1998, to which is attached a document entitled "General Conveyance, Assignment and Bill of Sale").

In addition to the foregoing documentary evidence, the parties stipulated to the following:

a. The original equipment/personal property in plant #1 of the leased premises—property on those premises prior to October 30, 1998—is comprised of items #1 ("Filter Press"), #10 ("Rotary Screen") and #18 ("Steel Tank") as designated in Windmill's Exhibit #16.

b. The items designated as #21, #22 and #23 in Windmill's Exhibit #16 are property of the debtor's bankruptcy estate.[1]

c. All other items designated in Windmill's Exhibit #16 were placed in the leased premises after October 30, 1998.

Finally, the following facts were stipulated between the parties in the pre-trial order:

1. The Debtor previously occupied the premises commonly known as 3–141 Street, Hammond, Indiana pursuant to a nonresidential real property lease.

2. The lease arose on or about October 30, 1998, with George Holmes, as lessor, agreeing to lease the premises to U.S. Liquids of Greater Chicago, Inc.

3. On or about March 12, 2004, and pursuant to an order of the Superior Court for Lake County, Indiana, U.S. Liquids assigned its rights in the lease to the Debtor as the sole tenant.

4. The Debtor purchased the U.S. Liquids of Greater Chicago, Inc. assets pursuant to the Assets Purchase Agreement.

5. After acquiring the assets, the Debtor operated the business of U.S. Liquids of Greater Chicago, Inc.

The Court's determination with respect to the sales motion will be made by applying provisions of the stipulated documents to the circumstances with respect to the designated items of equipment as provided by the parties' foregoing stipulations.

The contested matter under Rule 9011 will be determined based upon the application of the principles of that Rule to the Estate's objection, as that objection is either adequately supported or not supported by the foregoing record.

1. By order entered on August 1, 2007, the Court authorized the sale of these items pursuant to Windmill's motion.

## III. *LEGAL ANALYSIS*

The issue presented by the Estate's objection to Windmill's sales motion is that as a result of provisions in prior documents, Windmill has no property interest in certain of the property sought to be sold because those documents vested the property interest in that property in the Estate as the landlord of the premises leased by Windmill and utilized by it in the operation of its business. The contentions of the parties have essentially been set out in the sales motion, the Estate's objection to the sales motion, Windmill's response to that objection, and the pre-trial order.

The contentions of both Windmill and of the Estate concerning ownership of the subject property are primarily premised upon provisions of the documents submitted into evidence, principally the Agreement and Plan of Reorganization [Windmill's Exhibit # 1; paragraph 1 in section II above] and the Agreement of Lease [Windmill's Exhibit # 2; paragraph 2 in section II above]. In addition, the Estate collaterally makes reference to its own Exhibits 3 and 4 [paragraphs 4 and 5 of section II above] in support of its argument. The principal issue between the parties is thus the construction of written documents, in this case a contract and two lease agreements.

The issues between the parties revolve around the construction to be given to written documents, in this case contracts and/or leases. The rules of construction to be applied are indisputably those of the courts of the State of Indiana. The rules to be applied are the same whether one is construing a written contract, or a lease as a subcategory of a written contract. As stated in *Quebe v. Davis*, 586 N.E.2d 914, 918–19 (Ind.App. 1992):

> Disputes over interpreting a contract are resolved by finding the intent of the parties within the 'four corners' of the document. *McCae Management Corp. v. Merchants Nat'l Bank & Trust Co. Of Indianapolis*, 553 N.E.2d 884, 887 (Ind. App.1990), *trans. denied.* Where the intent of a lessor and lessee are discernible in a lease, the courts will give effect to their intent. *Edward Rose of Indiana v. Fountain*, 431 N.E.2d 543, 546 (Ind.App.1982). If the language used creates ambiguity, construction of the contract is a question of law. *McCae, supra.* The Court must construe a lease to harmonize its provisions. *See id.*

As stated in *Rieth–Riley Construction Co., Inc. v. Auto–Owners Insurance Company*, 408 N.E.2d 640, 645 (Ind.App.1980):

> In interpreting a contract, the court will first look to the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties. *Shahan v. Brinegar*, 181 Ind.App. 39, 390 N.E.2d 1036 (1979). If the contract is ambiguous or uncertain in its terms, then extrinsic circumstances and rules of contract construction may be employed to help construe the contract and ascertain the intent of the parties. Shahan, supra.; *Wills v. Gaff* (1963), 136 Ind.App. 21, 191 N.E.2d 41.
>
> A point not covered by an express contract may be implied by the court in carrying out the intention of the parties. *Coleman v. Chapman* (1966), 139 Ind. App. 385, 220 N.E.2d 285. Any ambiguities in a contract are to be strictly construed against the party who employed the language and who prepared the contract. *Colonial Mortgage Co. Of Ind., Inc. v. Windmiller*, 176 Ind.App. 535, 376 N.E.2d 529 (1978).

As stated previously, the rules for construction a lease are the same as those for

construction of a contract, as made clear by the following in *Scott–Reitz Ltd. v. Rein Warsaw Associates,* 658 N.E.2d 98, 103 (Ind.App.1995):

> A lease is construed in the same manner as any other contract. *Whiteco Industries, Inc. v. Nickolick,* 571 N.E.2d 1337, 1339 (Ind.App.1991), *trans. denied.* This Court will give effect to the parties' intent as shown by their written expression in the lease. *Edward Rose of Indiana v. Fountain,* 431 N.E.2d 543, 546 (Ind.App.1982). The lease will be read a as whole to ascertain its intended meaning, and in doing so, this Court gives the words of the lease their ordinary and common meaning unless a different meaning is clear from the lease's subject matter. *Ogilvie v. Steele by Steele,* 452 N.E.2d 167, 170 (Ind.App. 1983).

Finally, as stated in *Tastee–Freez Leasing Corp. v. Milwid,* Ind.App., 173 Ind.App. 675, 365 N.E.2d 1388, 1390:

> In resolving disputes as to the meaning of written contracts, courts must first examine the entire contract itself in order to ascertain the intent of the parties as expressed in the language used in the instrument. *Evansville–Vanderburgh School Corp. v. Moll,* 344 N.E.2d 831 (Ind.1976); *Fort Wayne Bank Bldg., Inc. v. Bank Bldg. & Eq. Corp.,* 160 Ind.App. 26, 309 N.E.2d 464 (Ind.App. 1974). In order to glean the meaning of a contract, all of its provisions must be considered rather than individual words, phrases or paragraphs. And, the court must accept an interpretation which harmonizes the provisions thereof, if that can reasonably be done. *Evansville–Vanderburgh School Corp. v. Moll,* supra.

The critical section of the Agreement and Plan of Reorganization is Section 1.4, which states as follows:

1.4 *Effect of Merger.* Except as herein specifically set forth, the identity, existence, purposes, powers, objects, franchises, privileges, permits, licenses, approvals, rights and immunities of Company shall continue unaffected and unimpaired by the Merger and the corporate franchises, existence and rights of Company shall be merged into Buyer, and Buyer, as the Surviving Corporation, shall be fully vested therewith. At the Effective Date of the Merger, the separate existence of Company shall cease and, in accordance with the terms of this Agreement, the Surviving Corporation shall possess all the rights, privileges, permits, licenses, approvals, immunities and franchises, of a public as well as of a private nature; and all property, real, personal and mixed, and (except as otherwise expressly set forth herein) debts on whatever account, including subscriptions to shares, and all other choices in action, and all and every other interest of or belonging to or due to each of Buyer and Company shall be taken and deemed to be transferred to, and vested in, the Surviving Corporation without further act or deed; and all property, rights and privileges, powers and franchises and all and every other interest shall be thereafter as effectively the property of the Surviving Corporation as they were of Buyer and Company; and the title to any real estate, or interest therein, whether by deed or otherwise, vested in Buyer and Company shall be deemed to be in the Surviving Corporation and shall not revert or be in any way impaired by reason of the Merger. The Surviving Corporation shall thenceforth be responsible and liable for all the liabilities and obligations of Buyer and Company and any claim existing, or action or proceeding pending, by or against Buyer or Company may be prosecuted as if the Merger had

not taken place, or the Surviving Corporation may be substituted in its place. Neither the rights of creditors nor any liens upon the property of Buyer or Company shall be impaired by the Merger, and all debts, liabilities and duties of each of Buyer and Company shall attached to the Surviving Corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it.

The only other section of the Agreement and Plan of Reorganization referred to by either party is Section 5.11, which states as follows:

5.11 *Personal Property; New Projects.* (I) Attached as Schedule 5.11(I) is a complete and accurate list and a complete description as of the date hereof of all personal property of Company including true and correct copies of leases for equipment and other personal property, if any, used in the operation of the Business and including an indication as to which assets were formerly owned by business or personal affiliates of Company. All of the trucks, compactors, tanks, containers, vehicles, machinery and other equipment of Company are in good working order and repair;

(ii) Company has good title to, or a valid leasehold interest in, the properties and assets used by it shown on the balance sheet dated the Balance Sheet Date or acquired after the date thereof, regardless of where located, including, without limitation, the items of personal property listed on Schedules 5.11(I), free

and clear of all security interests, liens or other Adverse Claims;

(iii) all leases set forth on Schedule 5.11(I) are in full force and effect and constitute valid and binding agreements of the parties thereto (and their successors) in accordance with their respective terms. No default by Company, or, to the best of Stockholders' knowledge, any other party to any of such leases, exists or would exist except for the passage of time or delivery of a notice or both;

(iv) all fixed assets used by Company in the operation of the Business are either owned by Company or leased by Company under an agreement indicated on Schedule 5.11(I). Company's combined fixed assets (together with the real property assets) constitute all of the real and personal property necessary for the operation of the Business both by Company and by the Surviving Corporation immediately following the Closing and include all of the permits, licenses, franchises, consents and other approvals necessary to operate the Business both before and immediately after Closing; and

(v) at the Closing, Company shall have good and marketable title to all personal property, free and clear of all debts and lease payments (including lease end buy-out payments) other than those included in the calculation of Actual Net Worth.

Finally, attached to the Agreement and Plan of Reorganization is a document entitled "Schedule 5.11 Personal Property of Company", referenced in Section 5.11 of the agreement.[2]

---

**2.** This Schedule contains a detailed list of equipment, and originally the Estate seemed to contend that the Schedule had never been attached to the Agreement and Plan of Reorganization. The status of this contention as it relates to this decision is not clear. In the first full paragraph on page 3 of the Pre–Trial

Order, it is stated that the "Estate claims that Schedule 5.11 delimits the assets transferred by the consummation of the merger pursuant to the Merger Agreement and no longer claims that the Schedule was not appended to the Merger Agreement". However, this statement is made in that portion of the Pre–Trial

■ The first order of business is to determine the identity of the property transferred by D & H Holding Company, Inc. to U S Liquids of Illinois, Inc. under the Agreement and Plan of Reorganization. The critical provision in Section 1.4 of that agreement is the following:

At the Effective Date of the Merger, the separate existence of Company [D & H Holding Company, Inc.] shall cease and, in accordance with the terms of this Agreement, ... and all property, real, personal and mixed, ... and all and every other interest of or belonging to or due to each of Buyer [U S Liquids of Illinois, Inc.] and Company shall be taken and deemed to be transferred to, and vested in, the Surviving Corporation without further act or deed; and all property, rights and privileges, powers and franchises and all and every other interest shall be thereafter as effectively the property of the Surviving Corporation as they were of Buyer and Company.

It is clear that this provision was intended to, and was effective to, transfer to U S Liquids of Illinois, Inc. all interests in personal property held by D & H Holding Company, Inc. as of the effective date of that agreement, i.e., October 30, 1998. The parties have stipulated that the equipment on the premises as of October 30, 1998 was limited to items # 1, # 10 and # 18 on Windmill's Trial Exhibit # 16, and that all of the other property disputed by the Estate in its objection to the sales motion was replaced and put on the premises subsequent to October 30, 1998. To state something so obvious as to probably not need to be stated, with respect to the

identity of property transferred by the Agreement and Plan of Reorganization, the issue concerning Windmill's acquisition of property under the foregoing Agreement is limited to those items designated as # 1, # 10 and # 18 on Windmill's Trial Exhibit # 16.

■ It is at this point that things become somewhat muddled. Initially, the Court determines that it is clear that Section 1.4 of the Agreement and Plan of Reorganization was effective to transfer all interests in personal property held by D & H Holding Company, Inc. as of October 30, 1998 to U S Liquids of Illinois, Inc. The mystery is inserted by Section 5.11/Schedule 5.11(I). Having reviewed Schedule 5.11 in relation to Windmill's Trial Exhibit # 16, the Court is unable to find in the former any equipment which matches the designation of items # 1, # 10 and # 18 in the latter. Schedule 5.11 supplements Section 5.11 of the Agreement, and the preamble to the Agreement states that the entirety of Section 5 relates to "Representations and Warranties of Stockholders and Company". Section 5.11(I) begins with the following statement:

Attached as Schedule 5.11(I) is a complete and accurate list and a complete description as of the date hereof of all personal property of Company including true and correct copies of leases for equipment and other personal property, if any, used in the operation of the Business and including an indication as to which assets were formerly owned by business or personal affiliates of Company.

Order that contains the debtor's contentions, and thus is it not certain that the Estate has given up on its contention that the Schedule was not included in the agreement. However, at the hearing held on July 27, 2007, the parties stipulated to inclusion in the record of

Windmill's Exhibit # 1, which does include Schedule 5.11, and thus the Court determines that the Estate no longer asserts that Schedule 5.11 was not in fact included in the foregoing agreement.

Windmill contends that Section 5.11 is merely a section relating to warranty of title, which does not alter the effect of the general transfer provision of Section 1.4. That might be true were it not for the fact that Section 5.11 so clearly states that "Schedule 5.11(I) is a complete and accurate list and a complete description as of the date hereof of all personal property of Company". Construing the contract as a whole, and being mindful of the fact that the Agreement and Plan of Reorganization is an extensively detailed agreement which contains nowhere else a description of the personal property transferred by its terms, the Court determines that Schedule 5.11 was intended to provide a specific designation of the property transferred to U S Liquids by its terms, *in addition to* providing a warranty with respect to that property. This is in accord with the principles of contract construction stated above, specifically that all provisions of a contract must be given effect, and that the entire contract must be harmonized as a whole.

The Court thus determines that items # 1, # 10 and # 18 in Windmill's Exhibit # 16 were not subject to the transfer of property interests effected by the Agreement and Plan of Reorganization. There is no ambiguity in the Agreement and Plan of Reorganization, and it is clear that these items were not subject to the Agreement and Plan of Reorganization. Even if one were to deem the terms of the Agreement and Plan of Reorganization to be ambiguous—which this Court does not—the parties have stipulated that these items were in place on the leased premises prior to October 30, 1998, and thus the clear inference which arises from the foregoing facts is that those items were not property of D

& H Holding Company, Inc.; were not transferred to U S Liquids of Illinois, Inc. by means of the Agreement and Plan of Reorganization, and thus are not property of the debtor's estate.[3]

The Court thus finds that items # 1, # 10 and # 18 as designated in Windmill's Trial Exhibit # 16 were never derivatively transferred to Windmill, and that as a result, those items do not constitute property of Windmill's bankruptcy estate which can be sold pursuant to the sales motion. The Estate's objection is sustained to the extent of these three items of property. The sustaining of this portion of the objection does not in any manner determine that these items are solely owned by the Estate. What has amazingly always been missing from this record is the derivation of the ownership of these items, most critically whether these items were either originally owned by the Estate or were "fixtures" in the premises leased by the Estate to the debtor, regardless of their titled ownership in the Estate. The matter before the Court is an objection to sale of these items by the debtor, which brings into contention solely whether these items are property of the debtor's bankruptcy estate, which the Court has determined they are not. The issue of who may be the owner of these items is not presented to the Court in this matter, and nothing in this decision has any effect on that issue, save to the extent that the debtor isn't the owner of these items.

■ From the foregoing factual stipulations, it can readily be seen that—with the exceptions of items # 1, # 10, # 18, # 21, # 22 and # 23 on Windmill's Trial Exhibit # 16—the remaining items subject

---

**3.** The parties have stipulated to inclusion in the record of the Estate's Trial Exhibit # 4. The "General Conveyance, Assignment and Bill of Sale" which comprises the second page of this Exhibit has no specific designation as to any item of property, and thus is not material to determination of the ownership interests in items # 1, # 10 and # 18.

to the sales motion as identified in Exhibit #16 were not in any manner the subject of any transfer of ownership interest effected by the Agreement and Plan of Reorganization, and are solely property of the debtor absent some agreement to the contrary. The parties have stipulated that these items first appeared on the leased premises subsequent to the effective date of that agreement. Because this matter has been submitted to the Court on a stipulated record, the Court concludes that those items were purchased and owned by either U S Liquids of Illinois, Inc. or by Windmill. The issue then becomes the effect of Section 7 of the Agreement of Lease upon the ownership interests of Windmill upon its vacation of premises leased from the Estate. The sole material provision of that agreement is Section 7(c), which states the following:

(c) Until the termination of this lease, title to all improvements, additions, alterations, replacements and fixtures on the Leased Premises, and the equipment and other items installed thereon by Tenant and any alteration, replacement, improvement or addition thereto, shall remain solely in Tenant. Tenant alone shall be entitled to deduct all depreciation for all improvements, fixtures, equipment, alterations, replacements and additions on Tenant's income tax returns. Upon termination of this lease, however brought about, all improvements, fixtures, equipment, alterations, replacements, improvements and additions in, on or to the Leased Premises made by Tenant or bought by Tenant may be removed by Tenant within a reasonable period of time after such termination (not to exceed 60 days), provided that any damage caused by reason of such removal shall be repaired at Tenant's expense. All improvements, fixtures, equipment, alterations, replacements, improvements and additions remaining on the Leased Premises after such reasonable period following the expiration of the Term of this lease shall be deemed abandoned by Tenant and shall become the property of Landlord.

The foregoing provision is a sub-section of a provision entitled "Maintenance and Alteration of Leased Premises". Giving effect to the entire agreement between the parties—in this case the lease between the debtor and the Estate—it is absolutely clear that this provision relates solely to "improvements, additions, alterations, replacements and fixtures on the Leased Premises and the equipment and other items installed thereon by Tenant", i.e., what are commonly thought of as fixtures, rather than items of personal property placed in a premises but not in any manner attached to it. The Estate seems to base its argument for its acquisition of title to the contested items upon the term "equipment" in the foregoing provision. In the first sentence of Section 7(c) of the document, the term "equipment" is clearly modified by the phrase "installed thereon by Tenant", and thus this lease provision is limited solely to an item which might be considered to be a fixture. There is no evidence in this record that the remaining contested items in any manner constitute a "fixture", and thus the Court finds that those items are items of personal property owned by Windmill which are not subject to the provisions of Section 7(c) of the Agreement of Lease. The Estate's objection to the sales motion with respect to these items is denied.

Based upon the foregoing, the Court finds that the objection of the Estate to Windmill's sales motion is sustained as to items #1, #10 and #18 in Windmill's Trial Exhibit #16, and is denied as to items #2, #3, #4, #5, #6, #7, #8, #9, #11, #12, #13, #14, #15, #16, #17,

# 19, # 20, # 21, # 22, # 23, # 24 and # 25.

 We next come to Windmill's Rule 9011 motion. The parties have not favored the Court with any citation of authority regarding the standards to be applied to that motion. The standards of Rule 9011 are self explanatory for the purposes of Windmill's motion, and those standards essentially require that an attorney or party who signs a document submitted to the Court certifies that to the best of his/her knowledge, information and belief, the provisions of Fed. R.Bankr.P. 9011(b) have been satisfied. Based upon the foregoing decision, the Court determines that the objection filed by the Estate to the sales motion, having been in part sustained, satisfies the requirements of Fed.R.Bankr.P. 9011. The Court thus determines that Windmill's Motion for Sanctions should be denied.

IT IS ORDERED, ADJUDGED AND DECREED that the Objection to Debtors' Motion for Authority to Sell Certain Assets filed by the Estate of George B. Holmes on June 6, 2007 is sustained with respect to items # 1, # 10 and # 18 in the list of property identified above as Windmill's Trial Exhibit # 16, and that said objection is denied as to the balance of the items of property designated in that list.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Windmill's Debtor's Motion for Sanctions Under Fed.R.Civ.P. 11 and Fed.R.Bankr.P. 9011 filed on July 9, 2007 is denied.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that a telephonic hearing will be held on **February 7, 2008, at 1:30 P.M.** at which counsel for the debtor shall appear to advise the Court of the extent to which the purchaser of the property subject to the sales motion may wish to proceed with the purchase of property which may be sold pursuant to that motion in accordance with this decision, and the consideration proposed to be paid by the purchaser with respect to that property.